Jennifer Paige SEXTON, Appellant,

v.

Larry Duane SEXTON, Appellee.

No. 2001–SC–0204–DG.

Supreme Court of Kentucky.

Jan. 22, 2004.

Sharon K. Morris, James Michael Morris, Morris & Morris, Lexington, for Appellant.

William Miles Arvin, Nicholasville, for Appellee.

OPINION of the Court by Justice KELLER.

## I. ISSUE

This dissolution-of-marriage action presents one primary issue for our consideration. Appellee owned an apartment building before his marriage to Appellant. During the marriage, in exchange for the apartment building, the parties acquired in their joint names an undivided one-sixth (1/6) partnership interest in Autumn Park Partnership (Autumn Park), a real estate partnership. At the time of the exchange, Appellee had a 94% nonmarital interest in the apartment building. Both the trial court and the Court of Appeals held that Appellee's nonmarital interest in the apartment building did not become marital property because the partnership interest was placed in the parties' joint names. Therefore, Appellee was awarded a 94% nonmarital interest in the parties' partnership interest in Autumn Park. Did Appellee's nonmarital interest in the apartment building transmute into marital property when the partnership interest was placed in the parties' joint names? Because, one, title is not controlling in determining property's character, and, two, Appellee and his parents did not intend for Appellant to

receive any interest in the partnership as a result of placing the partnership interest in the parties' joint names, we hold that Appellee's nonmarital interest in the apartment building did not become marital property simply because it was used to acquire property that was placed in the parties' joint names. Accordingly, we affirm the Court of Appeals's decision upholding the trial court's judgment awarding Appellee a 94% nonmarital interest in the parties' partnership interest.

## II. BACKGROUND

Appellant, Jennifer Paige Sexton, and Appellee, Larry Duane Sexton, married on May 26, 1984. At the time of their marriage, Appellee owned an eight-unit apartment building valued at $165,000 with a mortgage debt of $89,900 against it. Appellee thus had equity of $75,100 in the apartment building. During the marriage, the principal on the apartment building's mortgage was reduced by $20,764 as a

result of money gifts totaling $4,706 from Appellee's parents and by the application of $16,058 in rental proceeds from the apartment building.

In March 1992, the parties [1] conveyed the apartment building to Autumn Park [2] in exchange for a one-sixth (1/6) partnership interest that was placed in the parties' joint names. [3] In addition, Appellee individually executed a $69,000 note payable to his parents. This note represented the unpaid balance of the debt against the apartment building [4] and thus allowed Appellee to make a partnership contribution equal to the apartment building's unencumbered value. Appellee did not repay the note; rather, his parents gifted the $69,000 to him over the next few years. [5] The trial court determined that when the parties transferred the apartment building to the partnership, Appellee had a 94% nonmarital interest in the apartment building and the parties, together, had a 6% marital interest. [6]

1. Although the property was owned by Appellee prior to the parties' marriage and Appellee held record title solely in his name, Appellant was still required to join in the conveyance in order to convey or release her dower interest. KRS 392.020.

2. Autumn Park owns several apartment buildings. The partnership was operated by Appellee's parents, Darrell and Allie Sexton. Appellee's sister and her husband also conveyed an apartment building to the partnership in exchange for a one-sixth (1/6) partnership interest.

3. The Partnership Agreement set forth the respective interests of the partners as follows:

Based on the contribution of the mortgaging and pledging of the respective parties' real estate the interest and ownership of the Partners shall be as follows:
Two–Thirds (2/3's) interest—Darrell Sexton and Allie C.
Sexton, husband and wife
One–Sixth (1/6) interest—Larry D. Sexton and Jennifer P.
Sexton, husband and wife

One–Sixth (1/6) interest—Gary D. Davis and Pamela S.
Davis, husband and wife.

4. The exact balance was $69,136.

5. Appellee's parents, in effect, only gifted two-thirds (2/3) of the debt, or $46,091, since the debt against the apartment building was paid from partnership funds and his parents only owned a two-third (2/3) interest in the partnership. The loan forgiveness occurred over several years for tax purposes.

6. The trial court adopted the calculations of Appellee's expert witness, a certified public accountant, who calculated Appellee's nonmarital interest and the parties' marital interest using the following methodology: First, he determined that Appellee's nonmarital equity in the apartment building was $125,897 at the date of marriage. Appellee's expert arrived at this figure by adding to the $75,100 equity in Appellee's apartment building at the date of marriage, the following amounts: (1) the $4,700 in gifts from Appellee's parents during the marriage, and (2) $46,091 of the $69,136

The trial court found that Appellee's parents placed the Autumn Park partnership interest in both parties' names (rather than Appellee's name alone) only because the parties were married, and that there was no intent by Appellee's parents to benefit Appellant.[7] Similarly, the trial court found that Appellee's parents' forgiveness of the $69,000 note was intended as a gift to Appellee only. Additionally, the trial court found that the increase in the value of Autumn Park did not occur as a result of the efforts of the parties but solely from the efforts of Appellee's father, "the man running the show," who "intended the benefit to go to his son." Specifically, the trial court pointed out that no

marital funds were used to operate the partnership, and, even though Appellee worked for Autumn Park, he received a salary and "did not personally cause the increase." The trial court thus concluded that the parties did not as a "marital unit participat[e] or contribut[e] in any way" to Autumn Park's increase in value. As a result of its findings, the trial court found that the relative nonmarital and marital shares of the one-sixth (1/6) partnership interest in Autumn Park remained the same as they had prior to the exchange of the apartment building, i.e., Appellee had a 94% nonmarital interest and the parties together owned a 6% marital interest.[8] At

debt against the apartment building assumed by Appellee's parents. Next, he determined that the apartment building's equity was $134,622 on the date that it was conveyed to the partnership. He arrived at this amount by determining that the apartment building's value was $157,667 when it was conveyed to the partnership. Then, from this amount, the debt of $69,136 less that portion assumed by Appellee's parents ($46,091), or a net of $23,045, was deducted from the apartment building's value of $157, 667, resulting in equity of $134,622 in the apartment building at the time it was conveyed to the partnership ($157,667—($69,136—$46,091 = $23,045) = $134,622). Finally, using Appellee's nonmarital equity at the date of marriage ($125,897) as the numerator and the equity at the date of conveyance of the apartment building to the partnership ($134,622) as the denominator, he determined that Appellee's nonmarital interest in the apartment building was 94% ($125,897 ÷ $134,622 = 94%) with the remaining 6% interest being the parties' marital interest. (Note: the exact percentage is 93.5188%, however, it was shown on the accountant's calculations as the rounded-off number of 94%) Although Appellant disputes the characterization of the amounts used to determine Appellee's nonmarital interest in the apartment building, e.g., Appellant claims that the forgiveness of the $69,000 note was a gift to both parties, not solely a gift to Appellee, Appellant does not contest before this Court the methodology employed by the accountant and adopted by the trial court in determining the nonmarital and marital inter-

ests in the apartment building. Accordingly, we do not pass upon the correctness of the methodology employed by the accountant in determining the marital and nonmarital interests in the apartment building and then in the one-sixth (1/6) partnership interest.

7. Prior to including Appellant's name in the Partnership Agreement, Appellee's father, Darrell Sexton, received the advice of his attorney about the legal ramifications of doing so:

You have asked me about setting up the partnership for Autumn Park Apartments and the advisability of placing the children's spouses in a title position. It is my understanding that you have concerns if either of the children get [sic] a divorce what might happen to the partnership. It is my opinion that title is not a factor in a dissolution action, but rather is a matter of intent as to whether the non family spouse is given any interest in the property. It is my understanding that you plan to set up the partnership for estate tax purposes and do not intend for either your son-in-law or daughter-in-law to have any interest in the event of divorce. This is particularly true with the Lexington apartments. I do not see that adding their names will nullify your desired interest. (letter to Darrell Sexton from his attorney, dated March 5, 1992).

8. To determine the marital and nonmarital interests in the one-sixth (1/6) partnership interest in Autumn Park, the accountant, whose

the time the apartment building was conveyed to the partnership, the trial court found that the apartment building's total equity was $134,622, and therefore, Appellee's 94% nonmarital interest in the apartment building was worth $125,897.[9] At the time of trial in September 1998, the trial court determined that the one-sixth (1/6) partnership interest in the Autumn Park Partnership had increased in value to $507,410 and that Appellee's 94% nonmarital interest in the parties' partnership interest was, therefore, worth $476,965, and the parties 6% marital interest was worth $30,445. Accordingly, the trial court assigned Appellee's nonmarital interest of $476,965 to him and found that the marital interest of $30,445 should be equally divided between the parties.[10] A panel of the Court of Appeals, in a 2–1 split decision, found no abuse of discretion by the trial court and affirmed its allocation of the parties' partnership interest in Autumn Park. For reasons stated *infra*, we affirm the trial court' disposition of the partnership interest.

Appellant sought an award of her attorney's fees and costs, totaling $22,810, that she incurred in connection with her legal representation in the dissolution action, but the trial court, without making any findings, totally denied her request. The Court of Appeals, although noting that Appellant references evidence from the record, which indicates that Appellee will earn 450% of what Appellant will earn in the same period,[11] found no abuse of discretion and affirmed the trial court. We reverse

the Court of Appeals on this issue and remand the case to the trial court for reconsideration of Appellant's request for an award of attorney's fees and costs.

## III. ANALYSIS

### A. AUTUMN PARK PARTNERSHIP

Appellant claims that the trial court erroneously awarded Appellee a 94% nonmarital interest in the parties' one-sixth (1/6) partnership interest in Autumn Park and advances a number of arguments in support of this claim: first, the trial court ignored Kentucky's general partnership law in classifying the partnership interest and the allocation was erroneous under partnership law; second, the evidence presented by Appellee to show his nonmarital interest in the partnership was insufficient to meet the burden of proof for tracing nonmarital property; third, the debt forgiveness used to purchase the partnership interest was a gift to the marital unit, not Appellee individually; and fourth, Appellee's use of his nonmarital property to purchase the partnership interest in the parties' joint names transmuted Appellee's nonmarital property into a marital interest in the partnership. We find none of these arguments persuasive, and accordingly, we affirm the trial court's division of the parties' partnership interest in Autumn Park.

#### 1. Application of Partnership Law

■ Because the partnership agreement shows the one-sixth (1/6) partnership interest in Autumn Park in the parties' joint names, *i.e.*, "Larry D. Sexton and Jennifer

---

calculations were adopted by the trial court, simply used the same percentages of marital and nonmarital interests that he had previously determined that the parties owned in the apartment building.

9. $134,622 × 93.5188% = $125,897.

10. The entire marital share was assigned to Appellee; however, in order to effectuate an

equal division of marital property, marital property corresponding in value was assigned to Appellant.

11. The Court of Appeals also noted that Appellee "shows that between the court's award of maintenance and his own tax burden, the disparity between his after-tax income and hers is not as great."

P. Sexton, husband and wife," [12] Appellant argues that "partnership law must control because each of the parties already owns one-half of the undivided interest." Appellant posits that under partnership law she was a general partner in Autumn Park and was thus entitled to the benefits afforded by Kentucky's partnership law, namely, one-half (1/2) of the parties one-sixth (1/6) partnership interest. We disagree with Appellant's conclusion that partnership law controls the disposition of the parties' partnership interest in Autumn Park.

■■■ The disposition of parties' property in a dissolution-of-marriage action is governed by KRS 403.190,[13] and neither record title [14] nor the form in which it is held, *e.g.*, partnership, corporation, or sole proprietorship,[15] is controlling or determinative. Under KRS 403.190, a trial court utilizes a three-step process to divide the

**12.** The dissenting opinion in the Court of Appeals posited that because no provision exists in Kentucky's Uniform Partnership Act (UPA), KRS 362.150—362.360, that "allows a married couple to share a single, undivided share of a partnership interest[,]" "the attempt to convey the partnership interest to the parties as a married couple was ineffective[ ]" and resulted in the conveyance of a partnership interest to Appellant and Appellee "individually as partners, rather than as a couple with an undivided interest." We disagree. Although the UPA does not directly address this issue, we find nothing in the UPA to indicate that the legislature intended to preclude two or more persons, including a married couple, from owning a partnership interest as tenants in common if allowed by the partnership agreement or with the consent of the other partners. *Cf. Wehrheim v. Brent,* 894 S.W.2d 227, 229 (Mo.Ct.App.1995) ("We find nothing in § 358.240, nor anywhere else in the Uniform Partnership Act (UPA), to suggest that our legislature, in adopting the UPA, intended to abrogate the principle of tenancy by the entireties.... [C]ourts in several other states that recognize such tenancies have concluded that a partnership interest may be held by the entireties.").

**13.** *Travis v. Travis,* Ky., 59 S.W.3d 904, 908 (2001) ("The disposition of property in a dissolution of marriage action is governed by [KRS 403.190] [.]"); *Calloway v. Calloway,* Ky.App., 832 S.W.2d 890, 892 (1992) ("The Kentucky Legislature has established statutory guidelines by which the assets of a married couple are divided upon dissolution of marriage."); *Reeves v. Reeves,* Ky.App., 753 S.W.2d 301, 301–302 (1988) ("The statute controlling the disposition of property in a dissolution of marriage is KRS 403.190."); *Sousley v. Sousley,* Ky., 614 S.W.2d 942, 944

(1981) ("KRS 403.190 sets out the guidelines for the disposition of property in a marriage dissolution action."); *Farmer v. Farmer,* Ky., 506 S.W.2d 109, 111 (1974) ("KRS 403.190 controls the disposition of property in proceedings for the dissolution of a marriage.").

**14.** KRS 403.190(3) ("All property acquired by either spouse after the marriage and before a decree of legal separation is presumed to be marital property, regardless of whether title is held individually or by the spouses in some form of co-ownership such as joint tenancy, tenancy in common, tenancy by the entirety, and community property."); *Angel v. Angel,* Ky.App., 562 S.W.2d 661, 665 (1978) ("Under KRS 403.190(3), marital property is divided without regard to record title. When the trial court assigns 'each spouse's property' pursuant to KRS 403.190(1), record title should not be controlling."); Russell W. Goff, Note, *Title Doesn't Matter, Does it?: An Analysis of Kentucky's Property Disposition Law and Its Treatment of Transmutation,* 89 Ky. L.J. 255, 255–256 (2000–01) ("The fact that a party or parties appear as record owner of an asset does not confer property rights upon dissolution."; *Id.* at 278) ("Kentucky's marital property statute expressly disregards title in determining the characterization of property.").

**15.** 15 L. GRAHAM & J. KELLER, KENTUCKY PRACTICE, DOMESTIC RELATIONS LAW § 15.68 (2nd ed. West Group 1997) [hereinafter GRAHAM & KELLER] ("The form in which a business is held should not determine its classification as marital property"); *Holman v. Holman,* Ky., 84 S.W.3d 903, 907 (2002) ("Under Kentucky's statutory scheme for the distribution of property at dissolution, the trial court must first categorize each item of property as either marital or nonmarital under the framework embodied in

parties' property: "(1) the trial court first characterizes each item of property as marital or nonmarital; (2) the trial court then assigns each party's nonmarital property to that party; and (3) finally, the trial court equitably divides the marital property between the parties."[16] "An item of property will often consist of both nonmarital and marital components, and when this occurs, a trial court must determine the parties' separate nonmarital and marital shares or interests in the property on the basis of the evidence before the court."[17] Neither title nor the form in which property is held determines the parties' interests in the property; rather, "Kentucky courts have typically applied the 'source of funds' rule to characterize property or to determine parties' nonmarital and marital interests in such property."[18] "The 'source of funds rule' simply means that the charac- ter of the property, *i.e.*, whether it is marital, nonmarital, or both, is determined by the source of the funds used to acquire the property."[19]

■ In the present case, prior to the parties' marriage, Appellee owned the apartment building that was exchanged for the partnership interest,[20] and the apartment building's equity increased during the marriage, at least partially, as a result of gifts from Appellee's parents.[21] Thus, although the parties' partnership interest was acquired during the marriage, the trial court found that Appellee's nonmarital funds and property were primarily used to acquire it. Accordingly, the trial court properly rejected Appellant's argument that partnership law controlled and characterized the parties' interests in the Autumn Park partnership interest as both marital and nonmarital.

KRS 403.190[.]"); *Terwilliger v. Terwilliger,* Ky., 64 S.W.3d 816 (2002) (closely-held corporations found subject to division as marital property); *McGinnis v. McGinnis,* Ky.App., 920 S.W.2d 68 (1995) (nonvested shares of stock constituted marital property); *Walters v. Walters,* Ky., 782 S.W.2d 607 (1989) (corporate assets of husband's business before the marriage held nonmarital property); *Rupley v. Rupley,* Ky.App., 776 S.W.2d 849 (1989) (remanded for the trial court to consider marital interest in husband's corporation in determining the issue of unconscionability of parties property settlement agreement) *Culver v. Culver,* Ky.App., 572 S.W.2d 617 (1978) (corporation wholly owned by husband was held marital property); *Heller v. Heller,* Ky.App. 672 S.W.2d 945 (1984) (accounting practice constituted marital property); *Adams v. Adams,* Ky.App., 565 S.W.2d 169 (1978) (gift of corporate stock held nonmarital property); *Owens v. Owens,* Ky.App., 672 S.W.2d 67 (1984) (husband's partnership interest in law firm held marital); *Johnson v. Johnson,* Ky. App. 564 S.W.2d 221 (1978) (husband's partnership interest in a limestone business divided as marital property).

**16.** *Travis,* 59 S.W.3d at 909 (footnotes omitted).

**17.** *Id.* (footnotes omitted).

**18.** *Id.* (footnotes omitted).

**19.** *Id.* at 909 fn. 10 ((citing GRAHAM & KELLER, *supra* note 15, §§ 15.61 & 15.62) and Louise E. Graham, *Using Formulas to Separate Marital and Nonmarital Property: A Policy Oriented Approach to the Division of Appreciated Property on Divorce,* 73 KY. L.J. 41, 44 (1984–85)).

**20.** KRS 403.190(2) (" 'marital property' means all property acquired by either spouse subsequent to the marriage . . . ."); *Chenault v. Chenault,* Ky., 799 S.W.2d 575, 580 (1990) ("Property owned by a spouse prior to the marriage is also nonmarital property."); *Sousley,* 614 S.W.2d at 943 ("To begin with, the stock of the corporation, including the $30,000 cash infusion, was solely the property of Dr. Sousley prior to marriage and was, therefore, nonmarital."); KRS 403.190(2)(b) (excluding from the definition of marital property, "[p]roperty acquired in exchange for property acquired before the marriage or in exchange for property acquired by gift[.]").

**21.** KRS 403.190(2)(a) (excluding from the definition of marital property, "[p]roperty acquired by gift . . . during the marriage[.]").

### 2. Tracing of Appellee's Nonmarital Interest.

■■■ Appellant claims that the evidence presented by Appellee to show his nonmarital share in the Autumn Park partnership interest was insufficient to meet the burden of proof necessary for tracing nonmarital property. We disagree. "Tracing" is defined as "[t]he process of tracking property's ownership or characteristics from the time of its origin to the present."[22] In the context of tracing nonmarital property, "[w]hen the original property claimed to be nonmarital is no longer owned, the nonmarital claimant must trace the previously owned property into a presently owned specific asset."[23] The concept of tracing is judicially created[24] and arises from KRS 403.190(3)'s presumption[25] that all property acquired after the marriage is marital property unless shown to come within one of KRS 403.190(2)'s exceptions.[26] A party claiming that property, or an interest therein, acquired during the marriage is nonmarital bears the burden of proof.[27]

■■ Here, Appellee introduced evidence as to his nonmarital interest in the apart-

---

**22.** BLACK'S LAW DICTIONARY 1499 (7th ed.1999).

**23.** GRAHAM & KELLER, *supra* note 15, § 15.10. *Accord Brunson v. Brunson*, Ky.App., 569 S.W.2d 173, 176 (1978) ("The trial court recognized that Mrs. Brunson brought property into the marriage. However, because she failed to trace any of that money or property into any specific assets which were owned by the parties at the time of the separation, the trial court concluded that it had no power to assign any property to Mrs. Brunson as nonmarital property. The record supports the trial court's conclusion that Mrs. Brunson failed to trace the assets which she brought into the marriage into assets owned at the time of the separation. The trial court did not err in refusing to assign any amount to Mrs. Brunson as nonmarital property."); Goff, *Title Doesn't Matter, Does it?, supra* note 14 at 256 ("Currently, all assets belonging to married individuals at the time of dissolution are presumed to be marital property. To establish a separate interest in property, a spouse must show, through clear and convincing evidence, his or her non-marital interest in the property. This process of demonstrating a separate interest in what would otherwise be considered marital property is known as 'tracing.'").

**24.** *Chenault*, 799 S.W.2d at 578 ("Numerous decisions of this Court and the Court of Appeals have construed [KRS 403.190(3)] and from these decisions there has emerged the concept of 'tracing' although this term is nowhere found in the statute."); GRAHAM & KELLER, *supra* note 15, § 15.10.

**25.** KRS 403.190(3) ("All property acquired by either spouse after the marriage and before a decree of legal separation is presumed to be marital property, regardless of whether title is held individually or by the spouses in some form of co-ownership such as joint tenancy, tenancy in common, tenancy by the entirety, and community property.").

**26.** KRS 403.190(2) reads as follows:

For the purpose of this chapter, "marital property" means all property acquired by either spouse subsequent to the marriage except:
(a) Property acquired by gift, bequest, devise, or descent during the marriage and the income derived therefrom unless there are significant activities of either spouse which contributed to the increase in value of said property and the income earned therefrom;
(b) Property acquired in exchange for property acquired before the marriage or in exchange for property acquired by gift, bequest, devise, or descent;
(c) Property acquired by a spouse after a decree of legal separation;
(d) Property excluded by valid agreement of the parties; and
(e) The increase in value of property acquired before the marriage to the extent that such increase did not result from the efforts of the parties during marriage.

**27.** *Terwilliger*, 64 S.W.3d at 820 ("A party claiming that property acquired during the marriage is other than marital property, bears the burden of proof."); *Travis*, 59 S.W.3d at

ment building at the time of his marriage to Appellant and then at the time of its exchange for the partnership interest in Autumn Park. It was undisputed that Appellee solely owned the apartment building at the date of his marriage to Appellant and that he had accumulated considerable equity in it prior to the marriage. Appellee introduced checks totaling $4,706.35 and made payable only to him that both he and his parents testified were gifts solely to him and showed that payments corresponding to the amounts of the checks were made on the principal debt against the apartment building. He introduced a note in the amount of $69,000 signed only by him and payable to his parents.[28] Both Appellee and his parents testified that the forgiveness of this note was intended as a gift only to him. Other than the efforts of Appellee's father, the trial court found that no other events occurred that affected the parties' marital and nonmarital interests in the partnership interest. In fact, the trial court found that the increase in the value of the partnership interest was "not from the efforts of the parties" and that the efforts of Appellee's father were intended to benefit only Appellee. Based on the evidence, Appellee's accountant traced and calculated Appellee's nonmarital interest in the one-sixth (1/6) partnership interest in Autumn Park.[29] The trial court adopted the calculations of Appellee's accountant and found that the gifts from Appellee's parents were intended only for Appellee.

Specifically, as to the forgiveness of the $69,000 note, the trial court found "no intent to gift the interest to both parties in equal parts." Accordingly, we hold that the record supports the trial court's finding that Appellee sufficiently traced his nonmarital interest in the one-sixth (1/6) partnership interest in Autumn Park.

### 3. Forgiveness of Debt against Partnership Interest.

As previously stated, in addition to the parties' conveyance of the apartment building in exchange for the one-sixth (1/6) partnership interest in Autumn Park, Appellee individually executed a $69,000 note payable to his parents. Appellee's parents forgave this indebtedness over the next several years. Appellant contends that since the partnership interest was acquired during the marriage and placed in the parties' joint names, the forgiveness of the debt that Appellee owed on the purchase of the partnership interest was a joint gift to the parties that resulted in an increased marital interest in the partnership interest. Again, we disagree with Appellant's conclusion.

█ Like other nonmarital claimants of property acquired during marriage, a party claiming that property is nonmarital by reason of the gift exception has the burden to prove it.[30] Accordingly, the burden was on Appellee to prove that the forgiveness of the debt was a gift solely to him.[31] "A

---

912 ("KRE 403.190(3) explicitly allocates the burden of proof to the party claiming property as nonmarital[.]"); CR 43.01(1) ("The party holding the affirmative of an issue must produce the evidence to prove it.").

**28.** Appellee's sister also signed a similar note.

**29.** *Supra* note 6.

**30.** *Supra* note 27; *Browning v. Browning*, Ky. App., 551 S.W.2d 823, 825 (1977) (gift); *Farmer*, 506 S.W.2d at 112 (gift).

**31.** *Browning*, 551 S.W.2d at 825 ("The burden is on the Appellant to prove by clear and convincing proof that he acquired his interest by gift."); *Brosick v. Brosick*, Ky.App., 974 S.W.2d 498, 502 (1998) ("We recognize that KRS 403.190(3) creates a presumption that all property acquired during the marriage is marital. This presumption must be rebutted by clear and convincing evidence."); *Underwood v. Underwood*, Ky.App., 836 S.W.2d 439, 441 (1992) ("According to KRS 403.190(3), '[a]ll property acquired by either spouse after

'gift' in a common, ordinary, popular sense is a voluntary and gratuitous giving of something by one without compensation to another who takes it without valuable consideration."[32] Undoubtedly, the forgiveness of the note by Appellee's parents was a gift; therefore, the question remaining is whether it was a gift jointly to the parties or only to Appellee.

In *O'Neill v. O'Neill*,[33] a case involving a gift between spouses, the Court of Appeals set forth four (4) factors that trial courts should consider in determining if a transfer was a gift and thus a spouse's nonmarital property: one, "the source of the money with which the 'gift' was purchased," two, "the intent of the donor at that time as to intended use of the property," three, "status of the marriage relationship at the time of the transfer," and four, "whether there was any valid agreement that the transferred property was to be excluded from the marital property."[34] When the gift is from a third party, we would add a fifth factor: whether the purported donor received compensation for the transfer.[35] And, even though title is not determinative of whether a transfer to a party is a gift,[36] nevertheless, it is evidence for the trial court to consider.[37] Clearly, the donor's intent is the primary factor in determining whether a transfer of property is a gift,[38] and we likewise hold

the marriage and before a decree of legal separation is presumed to be marital property....' This presumption may be rebutted by clear and convincing proof that the property was acquired by, amongst other means, 'gift, bequest, devise, or descent.' "); *Adams*, 565 S.W.2d at 171 ("The question of whether property is considered marital or nonmarital is dependent on whether the property was a gift or was received as a result of consideration. To overcome the presumption that the property is marital, clear and convincing proof must be presented to show that the property was given as a gift."). We would note that a debt may be the subject of a gift by a creditor to his debtor. *Underwood*, 836 S.W.2d at 443.

32. *Browning*, 551 S.W.2d at 825 quoting *Bowman's Adm'rs v. Bowman's Ex'r*, 301 Ky. 694, 192 S.W.2d 955, 956 (1946). *Accord* 38 AM. JUR. 2D *Gifts* § 1 (1999) ("A 'gift' is a voluntary transfer of property by one person to another without any consideration or compensation therefore, whereby the donor manifests an intent that there be a present and irrevocable transfer of title to the subject matter of the gift."); BLACK'S LAW DICTIONARY 696 (7th ed. 1999) ("[G]ift" is "[t]he act of voluntarily transferring property to another without compensation.").

33. Ky.App., 600 S.W.2d 493 (1980).

34. *Id.* at 495.

35. *Supra* note 32; *Underwood*, 836 S.W.2d at 443 (holding that transfer of insurance agency

by father to his son was not a gift because son's agreement to continue father's employment with agency was consideration for transfer).

36. *Supra* note 14.

37. 38 AM. JUR. 2D *Gifts* § 19 (1999) ("The form of the transfer is among the circumstances that may be considered. However, in order for a gift to be valid, a transfer of title is not necessary; a showing that it was the intent of the donor to make a gift can negate the fact that actual title was not transferred."). *See also* Deborah H. Bell, *Equitable Distribution: Implementing the Marital Partnership Theory through the Dual Classification System*, 67 MISS. L.J. 115, 144–145 (1997) [hereinafter Bell, *Equitable Distribution* ] ("However, the basic test for determining whether a gift is joint or individual is the donor's intent. To make that determination, courts have looked to the following: statements of the donor, statements of the spouses, the tax treatment of the gift, whether the gift was jointly titled, the person to whom it was delivered, and the relationship between the donor and the spouses." (footnotes omitted)).

38. *Underwood*, 836 S.W.2d at 442–443 ("This Court has said on numerous occasions that the donor's intent is the primary factor in determining whether a transfer of property is a gift." *citing Clark v. Clark*, Ky.App., 782 S.W.2d 56, 63 (1990), and *O'Neill v. O'Neill*, Ky.App., 600 S.W.2d 493, 495 (1980)) *over-*

that the donor's intent is also the primary factor in determining whether a gift is made jointly to spouses or individually to one spouse.[39] The donor's testimony is highly relevant of the donor's intent; however, the intention of the donor may not only be "expressed in words, actions, or a combination thereof," but "may be inferred from the surrounding facts and circumstances, including the relationship of the parties[,]" as well as "the conduct of the parties[.]"[40] The determination of whether a gift was jointly or individually made is a factual issue, and therefore, subject to the CR 52.01's clearly erroneous standard of review.[41]

▆ In the present case, the trial court found that the debt forgiveness was intended by Appellee's father as a gift only to Appellee "with no intent to gift the interest to both parties in equal parts." This finding was supported by the testimony of Appellee and his father and by the letter from Appellee's father's attorney, which evidenced Appellee's father's intent

not to make a gift to Appellant.[42] Further, the trial court found that Appellant was added as an owner of the partnership interest "only because of her being [Appellee's] spouse." In other words, Appellee's father did not intend to make a gift to Appellant; she was only added as an owner of the partnership interest because of her marriage to Appellee, and therefore, she received no additional interest by reason of the partnership interest being placed in their joint names.[43] We find that the trial court's factual finding that the debt forgiveness was a gift intended solely for Appellee was not clearly erroneous and was sufficient to overcome the marital property presumption. Accordingly, the debt forgiveness against the partnership interest constituted a gift solely to Appellee that resulted in an increase in his nonmarital interest in the parties' partnership interest.

Appellant argues that under the holding of the Court of Appeals's decision in *Callo-*

---

*ruled in part on other grounds by Neidlinger.* See 38 AM. JUR. 2D *Gifts* §§ 17–19 (1999). With the exception of the donor's intent, the other three *O'Neill* factors have been described as being makeweight to give the trial court some flexibility when not convinced of the donor's veracity. GRAHAM & KELLER, *supra* note 15, § 15.18 ("In reality, the O'Neill factors are all makeweight with the exception of one: the donor's intent.... If the issue is the donor's veracity, however, a better test might have been constructed.").

39. Bell, *Equitable Distribution, supra* note 37, at 144 ("However, the basic test for determining whether a gift is joint or individual is the donor's intent.").

40. 38 AM. JUR. 2D *Gifts* § 19 (1999).

41. CR 52.01 ("Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses."); *Ghali v. Ghali,* Ky.App., 596

S.W.2d 31, 32 (1980) ("The trial judge was not clearly erroneous in finding that the two rings were gifts to the wife within the meaning of KRS 403.190.... It is well settled that Civil Rule 52.01 applies to domestic matters and that the principles of that rule require reviewing courts to accept findings of a trial judge unless they are clearly erroneous.").

42. *Supra* note 7.

43. *Angel,* 562 S.W.2d at 665 ("When the trial court assigns 'each spouse's property' pursuant to KRS 403.190(1), record title should not be controlling. Therefore, the tract conveyed in 1961 by gift from the wife's brother should be considered as the wife's nonmarital property unless the trial court finds that Ester Angel was named as a grantee *for a reason other than his marriage* to Mossie Lee." (emphasis added)). We would note that under KRS 403.190(3), the burden is placed on the nonmarital claimant to prove that the person contesting the nonmarital claim was named as a grantee as a result of marriage.

way v. Calloway,[44] the debt forgiveness "resulted in a gift to the marital unit which in turn, resulted in a marital asset." We disagree and observe that the factual circumstances in *Calloway* were significantly different from those in the case at bar. Specifically, the *Calloway* Court determined that "[a] review of the facts of the instant case clearly indicates not only that the race car was a gift, but that it was a gift to *both* Mr. and Mrs. Calloway."[45] Having made the determination that the race car was gifted to the parties jointly, the Court was then faced with whether to classify the race car as marital or nonmarital property and concluded that "[t]he more proper approach, we believe, is to classify them as marital property because they clearly were gifts to both parties, and to undertake their division based on the factors outlined in KRS 403.190(1)(a)-(d)."[46] Thus, "[t]he *Calloway* rule is not different from the *Angel* rule[47] since both attempt to effectuate the intent of the donor[,]"[48] *i.e.*, when the donor's intention is to make a joint gift, the property will be divided between the parties as marital property,[49] and when the donor's intention is to make an individual gift, the property will be assigned to a party as his or her nonmarital property.[50] Appellant's reliance on *Calloway* is misplaced. We would point out, however, that *Calloway* correctly places the burden of proof on the nomarital claimant in accordance with KRS 403.190(3).

### 4. Transmutation of Appellee's Nonmarital Property.

Relying on cases from other jurisdictions, Appellant contends that Appellee's nonmarital interest in the apartment building became the parties' marital property when he used it to acquire the partnership interest in Autumn Park and then caused it to be placed in the parties' joint names instead of Appellee's name only. In other words, Appellant is asking this Court to adopt the doctrine of transmutation, which has been described as follows:

> [Transmutation] occurs when separate property is treated in such a way as to give evidence of an intention that it become marital property. One method of causing transmutation is to purchase property with separate funds but to take title in joint tenancy. This may also be done by placing separate property in the names of both spouses. The rationale underlying [this doctrine] is that dealing with property in [this] way[ ] creates a rebuttable presumption of a gift to the marital estate. This presumption is based also upon the provision in many marital property statutes that property acquired during the marriage is presumed marital. The presumption can be rebutted by evidence of circumstances or communications clearly indicating an intent that the property remain separate.[51]

---

44. Ky.App., 832 S.W.2d 890 (1992).

45. *Id.* at 892–893 (emphasis added).

46. *Id.* at 893.

47. *Supra* note 43.

48. GRAHAM & KELLER, *supra* note 15, § 15.17.

49. Bell, *Equitable Distribution, supra* note 37, at 145 ("If a joint gift was intended, almost all

courts conclude that the gift is marital property subject to equitable distribution.").

50. KRS 403.190(2)(a) (excluding "[p]roperty acquired by gift . . . during the marriage.").

51. 2 H. Clark, *The Law of Domestic Relations in the United States* § 16.2, at 185 (1987) [hereinafter Clark, *Law of Domestic Relations*]. *See also* GRAHAM & KELLER, *supra* note 15, § 15.14 ("Transmutation can best be described by its outcome rather than

We decline to adopt the doctrine because it is inconsistent "with Kentucky's property division statute, which makes title irrelevant in determining property's character[,]" [52] with the principles of tracing established by Kentucky case law,[53] and with Kentucky's source of funds rule.[54] We would also note that transmutation through joint title would cause spouses not to trust each other. Rather than placing property in their joint names for estate planning purposes, they would be careful that their nonmarital property remains solely in their individual names and does not transmute into marital property.[55] We recognize that nonmarital property can in effect transmute into marital property when a nonmarital claimant fails to adequately trace his or her nonmarital interest and overcome the marital property presumption,[56] but that is simply a failure of proof and not the situation here. Accordingly, we reject Appellant's contention that Appellee's nonmarital interest in the apartment building transmuted into a marital interest solely because the partnership interest was placed in their joint names.

### 5. Cosigning on Autumn Park's Debt.

■ Both of the parties, along with the other named partners, cosigned on a $2,200,000 mortgage loan that Autumn Park obtained to purchase apartments for the partnership. Appellant seems to suggest that the partnership interest should be classified as marital property because she alleges that the parties' cosigning on the mortgage loan represented a marital contribution by the parties to acquire the partnership interest. We disagree. First, the parties' liability on the loan was contingent on Autumn Park not being able to repay the loan, and the value of the mortgaged apartments comfortably exceeded the loan amount. Appellant does not claim that the lender was looking to her as security for the loan. Clearly, the lender was looking to the mortgaged apartments to secure its loan. Second, Appellant's signature was required simply because she was shown as a partner of Autumn Park. Third, the lender and the parties were looking solely to the rents from the apartments—not to the parties' income—as the source for the monthly mortgage payments. Under the circumstances, the cosigning of the mortgage note by the par-

---

any particular event. If property has been transmuted, it becomes marital rather than nonmarital.... In some states property can be transmuted simply by placing the property in the spouses' joint names." (footnotes omitted)).

52. GRAHAM & KELLER, *supra* note 15, § 15.14.

53. *Supra* notes 23 and 24 and surrounding text.

54. *Supra* notes 18 and 19 and surrounding text; GRAHAM & KELLER, *supra* note 15 § 15.14.

55. Clark, *Law of Domestic Relations, supra* note 51, at 186 ("The moral for spouses with large amounts of separate property would seem to be that they should not trust each other but should be careful to ensure that

separate property does not get commingled or transmuted, a moral very destructive of good marriage relations.").

56. *Terwilliger*, 64 S.W.3d at 821 (remanded to trial court "to reconsider the issue of whether the claimed nonmarital share is sufficiently established."); *Travis*, 59 S.W.3d at 909 ("Appellant failed to rebut the presumption that the disputed proceeds were marital property, and therefore the trial court erred in assigning any portion of the disputed proceeds to Appellant as his nonmarital property."); *Marcum v. Marcum*, Ky., 779 S.W.2d 209, 211 (1989) ("In regard to the Mt. Zion tract, the husband did not produce sufficient proof to overcome the presumption that property acquired during the marriage shall be considered marital property.").

ties was *de minimis* and did not result in an increase in the marital interest in the parties' partnership interest in Autumn Park.

## B. ATTORNEY FEES AND COSTS

 KRS 403.220 reads in relevant part as follows:

> The court from time to time *after considering the financial resources of both parties* may order a party to pay a reasonable amount for the cost to the other party of maintaining or defending any proceeding under this chapter and for attorney's fees, including sums for legal services rendered and costs incurred prior to the commencement of the proceeding or after entry of judgment.[57]

Under this statute, a trial court may "order one party to a divorce action to pay a 'reasonable amount' for the attorney's fees of the other party, but only if there exists a disparity in the relative financial resources of the parties in favor of the payor."[58] "But even if a disparity exists, whether to make such an assignment and, if so, the amount to be assigned is within the discretion of the trial judge."[59] " 'There is nothing mandatory about it.' "[60] Thus, a trial court's ruling on attorney fees is subject to review only for an abuse of discretion.[61] "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles."[62]

In exercising its discretion in the present case, the trial court was required to consider the financial resources of both parties.[63] As noted by the Court of Appeals, a disparity existed in the financial resources of the parties after the dissolution. Appellant was assigned property with a value of less than $100,000 and was imputed annual income of $25,000. On the other hand, Appellee received property, including the partnership interest in Autumn Park, valued at more than $600,000 and has income of $114,000 annually. In addition to the parties' financial resources, the trial court should consider other relevant factors, including those set forth by our predecessor in *Boden v. Boden:*[64]

(a) Amount and character of services rendered.

(b) Labor, time, and trouble involved.

(c) Nature and importance of the litigation or business in which the services were rendered.

(d) Responsibility imposed.

(e) The amount of money or the value of property affected by the controversy, or involved in the employment.

---

57. KRS 403.220 (emphasis added).

58. *Neidlinger,* 52 S.W.3d at 519 (citations omitted).

59. *Id.* (citations omitted).

60. *Id.* (citations omitted).

61. 5 AM. JUR. 2D *Appellate Review,* § 695 (1995).

62. *Commonwealth v. English,* Ky., 993 S.W.2d 941, 945 (1999) (citations omitted); *Kentucky Nat. Park Com'n ex rel. Commonwealth v. Russell,* Ky., 301 Ky. 187, 191 S.W.2d 214, 217 (1945) ("Abuse of discretion in relation to the exercise of judicial power implies arbitrary action or capricious disposition under the circumstances, at least an unreasonable and unfair decision.").

63. KRS 403.220; GRAHAM & KELLER, *supra* note 15, § 19.2.

64. Ky., 268 S.W.2d 632, 633 (1954).

(f) Skill and experience called for in the performance of the services.

(g) The professional character and standing of the attorneys.

(h) The results secured.

Additionally, "obstructive tactics and conduct, which multiplied the record and the proceedings" are proper considerations "justify[ing] both the fact and the amount of the award." [65]

 The trial court did not set forth findings with respect to its denial of attorney fees and costs; [66] however, in fairness to the trial court, we point out that the parties did not request such findings.[67] As a result, we do not know if the trial court considered any factors other than the parties' financial resources before totally denying Appellant's request for attorney fees. Consequently, with such a significant inequality of resources, we conclude that the trial judge abused her discretion in totally denying Appellant's request for attorney fees and costs.[68] We, therefore, reverse the Court of Appeals's decision affirming the trial court's denial of attorney fees and costs and remand this issue to the trial court for its reconsideration.

## IV. CONCLUSION

For the above reasons, we affirm the Court of Appeals's decision upholding the trial court's disposition of the one-sixth (1/6) partnership interest in Autumn Park, and we reverse the Court of Appeals's decision affirming the trial court's total denial of attorney fees and costs. The issue of attorney fees and costs are remanded to the trial court for its reconsideration.

All concur.

**65.** *Gentry v. Gentry*, Ky., 798 S.W.2d 928, 938 (1990). *But see Cochran v. Cochran,* Ky.App., 746 S.W.2d 568, 570 (1988) ("The court based its award of attorney's fee upon its finding that the appellant's income is substantially more than the appellee's, and upon appellant's 'failure to be forthcoming' with information about a couple of his assets. The award based upon the latter could be made pursuant to a motion granted under CR 37. However, no such motion was made in the instant case, so an award based upon this reason is impermissible as contrary to the statute." (citation omitted)).

**66.** CR 52.01 ("In all actions tried upon the facts without a jury or with an advisory jury, the court shall find the facts specifically and state separately its conclusions of law thereon and render an appropriate judgment[.]"). *But cf. . Hollingsworth v. Hollingsworth,* Ky. App., 798 S.W.2d 145, 148 (1990) ("Although the court does not mention the financial resources of the appellee in its orders awarding the appellee attorney fees, there is no requirement that it do so. Nowhere does it state a trial court must make specific findings on the parties' financial resources.").

**67.** CR 52.04 ("A final judgment shall not be reversed or remanded because of the failure of the trial court to make a finding of fact on an issue essential to the judgment unless such failure is brought to the attention of the trial court by a written request for a finding on that issue or by a motion pursuant to Rule 52.02.").

**68.** *Beckner v. Beckner,* Ky.App., 903 S.W.2d 528, 530 (1995) ("The gross imbalance in the parties' income, $45,000+ compared to $0, plus the appellant's lack of any income-producing property should have entitled her to an award of such fees to defend this action."); GRAHAM & KELLER, *supra* note 15, § 19.2 ("[S]ignificant inequality of resources may call for an award of attorney fees.").