Mark A. SMITH, Appellant

v.

Amy H. SMITH, Appellee

NO. 2015-CA-000339-MR

Court of Appeals of Kentucky.

OCTOBER 28, 2016; 10:00 A.M.

BRIEF FOR APPELLANT: Michael T. Pate, LaGrange, Kentucky

BRIEF FOR APPELLEE: James L. Theiss, James Daniel ("J.D.") Theiss, LaGrange, Kentucky

BEFORE: J. LAMBERT, TAYLOR, AND THOMPSON, JUDGES.

## OPINION

J. LAMBERT, JUDGE:

In this dissolution action, Mark A. Smith has appealed from the portions of the Oldham Family Court's findings of fact and conclusions of law awarding his former wife, Amy H. Smith, a non-marital interest in the marital residence and in awarding her spousal maintenance. Finding no error or abuse of discretion, we affirm.

Amy and Mark were married on July 3, 1989, in Gaffney, South Carolina. They separated on August 30, 2013, and Amy filed a petition to dissolve the marriage the following month. At the time she filed the petition, she and Mark were both 44 years old and had lived in Kentucky for fifteen years. Amy was a stay-at-home mother, and Mark was employed at Ford Motor Company. Two children were born of the marriage, and the younger child, a son, had not yet reached the age of majority. In addition to the dissolution of their marriage, Amy sought sole custody of their minor child, child support, maintenance, restoration of non-marital property, division of marital property, and an award of costs and attorney fees. In his verified response, Mark requested joint custody of the minor child and disputed that Amy was entitled to maintenance or that there was any nonmarital property to be restored. A *status quo* order was entered.

By order entered February 7, 2014, the family court entered a *pendente lite* order and ruled that Amy and the parties' two children would have exclusive possession of the marital residence; the parties would have joint custody of their minor child, with Amy designated as the primary residential parent and Mark having visitation; Mark was to continue to pay the mortgage and utilities on the marital residence and maintain car insurance; Mark was to pay child support in the amount of $640.00 per month; Mark was to pay temporary maintenance in the amount of $800.00 per month; and Mark was to keep Amy and the children covered under his group health insurance plan.

Mediation attempts were unsuccessful, and a final hearing was scheduled for November 19, 2014. The court also ordered that the marital residence, as well as the improvements to it, be appraised.

The final hearing was held on November 19, 2014. Amy was the first witness to testify. After they married in 1989, they moved to North Carolina. She became pregnant, and after having their daughter, Amy stayed at home to raise her. In 1992, the family moved to Ohio where Mark got a job with Ford Motor Company. Shortly after the birth of their second child in 1998, Mark transferred to the Louisville plant, and they moved to Kentucky.

When Amy and Mark first lived in North Carolina, they lived in a mobile home gifted to her prior to the marriage by her grandparents. She and Mark sold the mobile home when they moved to Ohio. After staying with her mother and stepfather for a short time, Mark and Amy bought a house in Amherst, Ohio. When they moved to Kentucky, they lived in an apartment before purchasing another house, which was the then-current marital residence.

In 1990, shortly after their daughter, Jessica, was born, Amy's grandmother gifted her a $25,000.00 Wachovia Bank certificate of deposit. The CD listed Jessica as the beneficiary. Amy later cashed in the CD, which had increased in value with accumulated interest, and they used this $26,000.00 as the down payment on the house in Amherst. Mark and Amy chose this area because it had a good school district. They paid $66,000.00 for the house, and they borrowed $40,000.00. They paid on the mortgage for about six years. In 1998, Mark and Amy purchased a house in Oldham County for $150,000.00. They borrowed $92,300.00 and paid $57,700.00 as a down payment, which came from the sale of the Amherst house. They refinanced the Oldham County property more than once, most recently in 2009 for $125,841.00. In addition, Mark's grandmother had given Mark $5,000.00, which they used to convert

the one-car garage into a bedroom in their Amherst, Ohio home.

After purchasing the Oldham County property in 1998, Amy and Mark completed several improvements. They black-topped the gravel driveway, built a pole barn, installed ceramic tiles in the bathroom and the basement, installed hardwood floors in the kitchen, converted the garage into a walkout living area, and built a sunroom on the deck. The current balance owed on the mortgage was $114,884.00. The property had also been appraised by Ida Davis, and she set the fair market value at $237,000.00. Amy believed value added by the six projects in the Oldham County property totaled $26,000.00. Amy stated that she and Mark used the funds from refinancing the property to purchase land in Alabama and to pay for the renovation projects.

Amy testified that she had not worked outside of the home for more than twenty years. She briefly worked as a waitress in Ohio when their daughter, Jessica, was young, and she had about two years of college education, where she studied nursing and elementary education. She planned to enroll in an eight-month dental assistant program. She admitted that she had only applied for two jobs at elementary schools. Amy testified about Mark's monthly income and that her monthly expenses totaled $4,253.23 per month.

Amy's mother, Elizabeth Orbison, testified next. Ms. Orbison drafted an affidavit on January 3, 2014, related to the $25,000.00 CD. She was aware that Florence Tash Hager, her former mother-in-law, had gifted this CD to Amy. She was also aware that Florence and Joseph Hager, her former in-laws, had given a mobile home to Amy in North Carolina. In 1984, Ms. Orbison's aunt gifted Amy with 100 shares of Ohio Edison stock. She saw the CD that was given to Amy with Jessica listed as the beneficiary, but she did not have a copy of it. It was to be used at Amy's discretion. These were all gifts to Amy.

Mark testified that he works at Ford Motor Company in paint repair and had worked for the company for more than 22 years. He earned $28.76 per hour and worked 50 hours per week, although his hours would eventually go to 40 hours per week. He also received performance bonuses and profit sharing, which were not guaranteed every year. Mark testified that his average net income per month was $4,646.76. He paid $3,319.71 to or on behalf of Amy every month, including child support, maintenance, and the mortgage. His monthly expenses totaled $1,109.94. Mark wanted the marital residence to be sold and the net proceeds from the sale, along with the rest of the marital property, to be divided equally between him and Amy. Regarding the $25,000.00 CD, Mark said they had an understanding that it was to be used for Jessica's college education. He and Amy decided they would rather use it for a down payment on a house in a good school system. They used the $5,000.00 he received from his grandmother to renovate the garage in the Amherst house. During cross-examination, Amy's attorney introduced evidence that Mark earned $7,803.00 per month.

Following the hearing, the parties filed memoranda, and Amy included a *Brandenburg v. Brandenburg*, 617 S.W.2d 871 (Ky. 1981), calculation establishing that she had a non-marital interest in the marital residence in the amount of $66,158.00 and that Mark had a non-marital interest in the amount of $12,720.00. Mark disputed that Amy had adequately traced her non-marital interest. Amy also requested an open-ended maintenance award of $2,162.00 per month. Mark argued that she was not entitled to any maintenance.

On February 2, 2015, the family court entered a judgment and decree of dissolution and incorporated its separately entered findings of fact and conclusions of law in which it ruled on the contested issues. As to the marital residence, the family court assigned Amy $66,158.00 and Mark $12,719.00 as their respective non-marital interests and then divided the remaining equity equally between them. Mark was to continue to pay the mortgage, insurance, and taxes until the property was sold. The court also addressed and divided other marital property and debts. After imputing income to her and reducing her claimed monthly expenses, the court found that Amy was entitled to an award of maintenance in the amount of $1,050.00 per month for 84 months. The court went on to award sole custody of the minor child to Amy and ordered Mark to pay child support in the amount of $721.50 per month effective February 1, 2015. Finally, the court ordered Mark to pay $2,500.00 in attorney fees directly to Amy's attorney. On Amy's motion, the court slightly modified its findings of fact and conclusions of law. This appeal now follows.

In his appeal, Mark raises two issues. One addresses the family court's decision to restore Amy's non-marital interest in the marital residence and the second addresses the maintenance award. Amy contends that the family court's rulings should be affirmed.

Kentucky Rules of Civil Procedure (CR) 52.01 provides the general framework for the family court as well as review in the Court of Appeals: "In all actions tried upon the facts without a jury or with an advisory jury, the court shall find the facts specifically and state separately its conclusions of law thereon and render an appropriate judgment[.] ... Findings of fact, shall not be set aside unless clearly erroneous, and due regard shall be given to the

opportunity of the trial court to judge the credibility of the witnesses." *See Moore v. Asente*, 110 S.W.3d 336, 354 (Ky. 2003) (footnote omitted) (An appellate court may set aside a lower court's findings made pursuant to CR 52.01 "only if those findings are clearly erroneous."). The *Asente* Court went on to address substantial evidence:

"[S]ubstantial evidence" is "[e]vidence that a reasonable mind would accept as adequate to support a conclusion" and evidence that, when "taken alone or in the light of all the evidence, ... has sufficient probative value to induce conviction in the minds of reasonable men." Regardless of conflicting evidence, the weight of the evidence, or the fact that the reviewing court would have reached a contrary finding, "due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses" because judging the credibility of witnesses and weighing evidence are tasks within the exclusive province of the trial court. Thus, "[m]ere doubt as to the correctness of [a] finding [will] not justify [its] reversal," and appellate courts should not disturb trial court findings that are supported by substantial evidence.

*Id.* at 354 (footnotes omitted). With this standard in mind, we shall address the issues Mark raises in his brief.

 Mark's first argument addresses whether the family court properly restored Amy's non-marital interest in the marital residence. He asserts that Amy did not sufficiently establish evidence that the $25,000.00 CD existed or trace the funds from the CD to the increased value in the marital residence.

A trial court's ruling regarding the classification of marital property is reviewed *de novo* as the resolution of such issues is a matter of law. *Heskett v.*

*Heskett*, 245 S.W.3d 222, 226 (Ky. App. 2008). We review a trial court's determinations of value and division of marital assets for abuse of discretion. *Armstrong v. Armstrong*, 34 S.W.3d 83, 87 (Ky. App. 2000) (quoting *Duncan v. Duncan*, 724 S.W.2d 231, 234–35 (Ky. App. 1987)).

*Young v. Young*, 314 S.W.3d 306, 308 (Ky. App. 2010). For purposes of this appeal, Kentucky Revised Statutes (KRS) 403.190(2)(a) defines "marital property" as "all property acquired by either spouse subsequent to the marriage except ... [p]roperty acquired by gift, bequest, devise, or descent during the marriage and the income derived therefrom unless there are significant activities of either spouse which contributed to the increase in value of said property and the income earned therefrom[.]"

In *Sexton v. Sexton*, 125 S.W.3d 258 (Ky. 2004), the Supreme Court of Kentucky extensively addressed the classification and division of property. The Court explained that "[u]nder KRS 403.190, a trial court utilizes a three-step process to divide the parties' property: '(1) the trial court first characterizes each item of property as marital or non-marital; (2) the trial court then assigns each party's non-marital property to that party; and (3) finally, the trial court equitably divides the marital property between the parties.' " *Id.* at 264–65 (footnote omitted). A piece of property could consist of both marital and non-marital components, which would then require the court to "determine the parties' separate nonmarital and marital shares or interests in the property on the basis of the evidence before the court." *Id.* at 265 (footnote omitted). The court must apply the "source of funds" rule in order to characterize the property or the parties' interests in it as marital or non-marital. *Id.* (footnote omitted). The Court stated that

"[n]either title nor the form in which property is held determines the parties' interests in the property[.]" *Id.*

The *Sexton* Court went on to explain the concept of tracing as it applies to the determination of whether property, or some portion of it, is marital or non-marital:

> "Tracing" is defined as "[t]he process of tracking property's ownership or characteristics from the time of its origin to the present." In the context of tracing nonmarital property, "[w]hen the original property claimed to be nonmarital is no longer owned, the nonmarital claimant must trace the previously owned property into a presently owned specific asset." The concept of tracing is judicially created and arises from KRS 403.190(3)'s presumption that all property acquired after the marriage is marital property unless shown to come within one of KRS 403.190(2)'s exceptions. A party claiming that property, or an interest therein, acquired during the marriage is nonmarital bears the burden of proof.

*Sexton*, 125 S.W.3d at 266 (footnotes omitted).

In the present case, the family court held that Amy established her non-marital claim on the equity in the marital residence by her use of the $26,000.00 she obtained from cashing in the CD from her grandmother for the down payment on the home in Amherst, Ohio. The funds from the sale of that house, including Amy's non-marital interest, were then used to purchase the home in Oldham County. Mark contends that because she did not produce a copy of the CD or any other documentation to establish this, her claim must fail. We disagree.

Amy presented her own testimony along with testimony from her mother, Ms. Orbison, to establish that she had received the

$25,000.00 CD as a gift from her grandmother, Florence Hager. Mark also testified that the funds from the CD were used to make the down payment on the Amherst, Ohio residence, although he maintained that the original purpose for the funds was to pay for their daughter's college education. Regardless of what the original intent for the CD was, the evidence establishes that the funds Mark and Amy used for the down payment on the Amherst, Ohio marital residence came from cashing in the CD. Substantial evidence in the record supports the family court's findings on this issue. Therefore, we reject Mark's claim that Amy failed to sufficiently trace her non-marital contribution to the marital residence.

Mark also argues that Amy failed in her burden to establish why the increase in value of the marital residence occurred. In *Travis v. Travis*, 59 S.W.3d 904, 910–11 (Ky. 2001), our Supreme Court addressed the increase in value of an item of property that includes both marital and non-marital components:

> When the property acquired during the marriage includes an increase in the value of an asset containing both marital and nonmarital components, trial courts must determine from the evidence *"why* the increase in value occurred" because "where the value of [nonmarital] property increases after marriage due to general economic conditions, such increase is not marital property, but the opposite is true when the increase in value is a result of the joint efforts of the parties." KRS 304.190(3), however, creates a presumption that any such increase in value is marital property, and, therefore, a party asserting that he or she should receive appreciation upon a nonmarital contribution as his or her nonmarital property carries the burden of proving the portion of the increase in value attributable to the nonmarital contribution. By virtue of the KRS 403.190(3) presumption, the failure to do so will result in the increase being characterized as marital property. [Footnotes omitted, emphasis in original.]

We agree with Amy that the increase in value of the marital residence from $150,000.00 at the time of the purchase to $237,000.00 at the time of the appraisal is attributable to the $26,000.00 in improvements, which is a marital contribution, and the improved market conditions. There had been no principal debt reduction made on the property. Pursuant to *Brandenburg, supra*, the family court properly multiplied the percentages of both Amy's and Mark's non-marital contributions to the total contributions (the down payment and the improvements) against the equity in the property to calculate their respective non-marital shares. Therefore, we find no error in the family court's restoration of Amy's non-marital interest in equity of the marital residence.

Next, Mark contends that the family court erred in awarding Amy spousal maintenance. The family court awarded her $1,050.00 per month for a period of 84 months. Mark argues that Amy had not taken any real steps to obtain employment and that she had sufficient property awarded to her to meet her needs. We disagree.

KRS 403.200(1) provides that a court may grant maintenance once it finds the spouse seeking an award:

(a) Lacks sufficient property, including marital property apportioned to him, to provide for his reasonable needs; and

(b) Is unable to support himself through appropriate employment[.]

"While the award of maintenance comes within the sound discretion of the trial court, a reviewing court will not uphold the

award if it finds the trial court abused its discretion or based its decision on findings of fact that are clearly erroneous." *Powell v. Powell*, 107 S.W.3d 222, 224 (Ky. 2003) (citations omitted). *See also Brenzel v. Brenzel*, 244 S.W.3d 121, 126 (Ky. App. 2008) ("An award of maintenance and the amount are within the discretion of the trial court.").

■ Once a trial court decides that an award of maintenance is appropriate, it must then consider all of the relevant factors as listed in KRS 403.200(2) to determine the amount and duration of maintenance that should be awarded. These factors include the spouse's financial resources, the time needed to obtain sufficient education or training, the standard of living during the marriage, the duration of the marriage, the age and condition of the spouse seeking maintenance, as well as the ability of the paying spouse to meet his own needs. Like the decision to award maintenance, "the amount and duration of maintenance is within the sound discretion of the trial court." *Weldon v. Weldon*, 957 S.W.2d 283, 285 (Ky. App. 1997). "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Sexton v. Sexton*, 125 S.W.3d 258, 272 (Ky. 2004) (citing *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999)); *Kentucky Nat. Park Com'n ex rel. Commonwealth v. Russell*, 301 Ky. 187, 191 S.W.2d 214, 217 (1945).

■ In the present case, Amy requested an open-ended maintenance award in the amount of $2,162.00 per month. She also claimed that her reasonable monthly expenses totaled $4,253.23. The family court carefully considered her testimony and ul-

timately found that not all of her claimed living expenses were reasonable because they included expenses for the children. Therefore, the court determined that Amy's reasonable monthly living expenses totaled $3,040.23, which included her mortgage, utility, and insurance expenses that Mark would no longer be paying once the house was sold.[1] The court then imputed a minimum wage earning potential to Amy based upon her lack of a work history and her educational background. This totaled $1,256.67 per month. Based upon these findings, the court determined that Amy was entitled to a maintenance award. The court went on to consider the factors set forth in KRS 403.200(2), including Mark's admitted income of $7,803.00, his ability to meet his own reasonable needs, the length of the marriage, and their standard of living during the marriage. Based upon these factors, the court determined that Amy was entitled to maintenance in the amount of $1,050.00 per month for a period of 84 months, much less in amount and for a shorter period than she had requested.

Mark contends that Amy is precluded from an award of maintenance due to her failure to seek employment after she filed the petition for dissolution. As the family court pointed out and Amy argues, her efforts to secure employment are not a part of the statutory criteria for the court to consider whether an award of maintenance is warranted. Mark also argues that Amy was awarded sufficient property to meet her reasonable needs, including half interests in his TESPHE account and his Ford retirement account, Ohio Edison stock totaling $5,052.64, and half of the net proceeds from the sale of the marital residence. The net proceeds totaled $118,879.05. However, Amy points out that

---

1. We disagree with Mark's assertion that the court concluded that Amy's reasonable living expenses totaled $1,729.00.

she would not have access to Mark's retirement accounts until he retired or, in the case of the TESPHE account, she would incur taxes and penalties if she withdrew any funds. Furthermore, we note that the family court certainly took into consideration assets Amy received in the dissolution because the amount the court awarded her left her with a $733.56 deficit per month, not taking into consideration the child support she was awarded.[2] Accordingly, the family court did not abuse its discretion in awarding maintenance to Amy, or in the amount or duration of the maintenance award.

For the foregoing reasons, the judgment of the Oldham Family Court is affirmed.

ALL CONCUR.

---

2. $1256.67 (minimum wage job at 40 hours per week) + $1050.00 (maintenance) - $3040.23 (Amy's reasonable monthly expenses) = -$733.56.