**Cynthia MCVICKER, Appellant**

v.

**William MCVICKER, Appellee**

**NO. 2013–CA–001271–MR**

Court of Appeals of Kentucky.

RENDERED: FEBRUARY 6, 2015; 10:00 A.M.

Rehearing Denied May 1, 2015

Hugh W. Barrow, Louisville, Kentucky, for appellant.

Dwight Preston, Elizabethtown, Kentucky, for appellee.

BEFORE: ACREE, CHIEF JUDGE; JONES AND J. LAMBERT, JUDGES.

*OPINION*

LAMBERT, J., JUDGE:

In this dissolution action, Cynthia McVicker has appealed from the April 23, 2013, and June 25, 2013, orders of the Hardin Family Court and seeks review of the assignment of non-marital property, the division of marital property, and the failure to award maintenance. We have carefully examined the record and reviewed the parties' briefs, and finding that the family court erred and abused its discretion, we reverse in part and vacate in part, and remand for further proceedings.

Cynthia and William McVicker were married on October 1, 1977, in Rockcastle County, Kentucky. There is one surviving child born of the marriage, William McVicker Jr. (Willy), who is now an adult, but is totally disabled and dependent. Cynthia and William are his joint guardians. After close to thirty-two years of marriage, the parties separated in June 2009, and Cynthia filed a verified petition for dissolution of marriage on November 16, 2009. At the time of the filing of the petition, Cynthia was fifty-four years old, and she worked as an office manager for the Hardin County Board of Education. William was sixty-two years old, and he had retired from his position as a heating and cooling auditor for Kentucky Utilities. In her prayer for relief, Cynthia requested that the marriage be dissolved, for distribution of the parties' marital property, and for adjudication of their debts and obligations. In his response, William asked that the court grant the parties shared custody of their adult disabled child, with the child spending 50% of his time with each parent and with the child support obligation based upon the rules for shared custody. The court entered a mutual restraining order on January 12, 2010, which did not prohibit legitimate contact between the parties concerning parenting time with their son.

By agreed order entered March 23, 2010, the court granted William exclusive use of the marital home and ordered him to pay the costs to maintain the home during the pendency of the action. The parties would continue to have shared custody of their disabled son, with Cynthia continuing to manage his social security disability payments and William continuing to pay medical insurance for all three. In September 2010, William moved the court to name him as the primary possessory parent of the parties' adult child, as he had assumed such a role when Cynthia left the marital residence in November 2009. He also requested the court to order Cynthia to hand over management of the child's social security and disability benefits to him. While the order is not contained in the record, this motion appears to have been granted.

Pursuant to the March 2010 agreed order, the court permitted Cynthia to draw $500.00 per month starting in January 2010 from their investment funds. They agreed that "this payment will not prejudice any of the parties concerning the ultimate disposition of the marital estate versus the Pre Marital and Non marital estate or the ultimate disposition concerning temporary or permanent maintenance." The parties further agreed that the court "could be allowed to offset the funds withdrawn pursuant to this Agreed Order in accordance with the evidence as presented to the Court and in accordance with the law."

Cynthia continued to request funds during the pendency of the action. In May 2010, Cynthia filed a motion seeking an early disbursement from her marital property to cover the purchase price of a 2011 Honda Pilot and the first year's insurance premium, for a total amount of $38,000.00.

She stated that the 1998 Dodge Caravan van she had been driving had come into disrepair and that the cost to repair it was in excess of $2,200.00 at a minimum. This motion was apparently denied, and the following month, Cynthia filed another motion, this time seeking payment of $722.95 per month and a one-time lump sum of $1,500.00 from the parties' investment account for the purchase of the Honda Pilot. In addition, she requested half of the parties' 2009 income tax refund. By Agreed Order entered July 19, 2011, the court ordered William to provide Cynthia with the total sum of $1,842.26 from their Morgan Stanley account to pay her insurance, registration, and taxes on her new vehicle. The amount she received would be considered in the final division of the marital estate. By Agreed Order entered October 17, 2011, the court ordered William to provide Cynthia with $1,300.00 from their investment account to pay her 2010 income tax liability. Again, this amount would be considered in the final division of the marital estate.

On January 31, 2012, Cynthia filed a motion requesting temporary maintenance or that she be advanced the sum of $7,000.00 from the marital estate so that she could pay her current expenses. In an affidavit attached, Cynthia stated that she had outstanding debts of $5,960.51, including credit card debt and medical fees, and that she did not have sufficient income to pay that amount. She earned a net income of $1,534.03 per month from her employment. William objected to the motion, stating that his income would be decreasing significantly in May 2012 from $1,815.81 to $520.81 per month. He had also assumed all of the marital debts, the cost of maintaining the marital residence, and the payment of medical insurance for himself, Cynthia, and their son. In his attached affidavit, William stated that since April 2010, Cynthia had received $42,900.00 from their investment account, and she was drawing $1,222.95 per month to help with her expenses in accordance with a 2010 agreement as well as other additional amounts she had requested.

On July 5, 2012, Cynthia filed a motion requesting the sum of $8,000.00 from the marital estate so that she could pay her living expenses and legal fees. In addition to her recurring monthly expenses, she stated that she needed the funds to pay for her car insurance and taxes, for car repair, and for summer yard maintenance. That amount also included $2,000.00 for medical care and for upcoming travel and family events, including weddings and graduations. Cynthia stated that William had permitted his medical insurance policy to lapse, leaving her with expensive, regular medical care.

In December 2012, Cynthia filed another motion requesting the court to allow her to withdraw $8,000.00 from the marital investments to pay her current living expenses and legal fees. She also moved the court to order an appraisal of the marital home and William's tools. In an attached affidavit, Cynthia stated that she earned $1,654.00 per month through her employment and that pursuant to temporary orders of the court, she received $500.00 per month from the marital investment account to assist with the payment of her monthly expenses that totaled $2,393.42. She stated that she had incurred $2,000.00 in medical and dental expenses and that her car insurance and taxes were due to be paid. By Agreed Order entered January 7, 2013, the court granted Cynthia's motion as to the release of funds and appraisals.

William filed his final disclosure statement in May 2012, listing his monthly net retirement income as $181.81 (his gross income was $520.81) and his monthly social security payment as $1,371.00. As non-

marital property, he listed $145,058.00 representing gifts from his parents that had been invested in stock. The original amount had been $117,000.00. He also listed $30,000.00 as pre-marital equity in the marital residence. The parties' Morgan Stanley account had a fair market value of $159,154.00, and William stated that Cynthia had withdrawn $71,270.00 from the account since February 2010. William stated that the marital residence had a fair market value of $78,900.00, and he listed his vehicles, including a 2001 Mazda Miata worth $4,900.00 and a 2002 Kia Rio worth $1,475.00. William listed his monthly expenses as totaling $2,058.00. In his prehearing compliance, William requested an unequal division of marital property of 70% to him and 30% to Cynthia, citing his continued care of their disabled child. William updated his final disclosure statement in December 2012 to show that his net retirement pay was $337.81 per month; the invested gifts from his parents totaled $152,512.36; and the Morgan Stanley account totaled $153,470.27, with Cynthia having withdrawn $87,830.96 as of December 1, 2012.

On December 11, 2012, Cynthia filed her prehearing compliance, in which she stated that William's non-marital claims were unsupported by the evidence and not properly traced. She also argued that William's request for additional marital property due to his guardianship of their disabled son was not a factor to be considered in the division of marital property.

The court held a final hearing on January 10, 2013. The deposition of Alpha McVicker was admitted without objection as an exhibit at the beginning of the hearing. Mrs. McVicker, William's mother, testified about the money she and Harry McVicker, her husband and William's father, had given to William via checks. She identified twenty-three checks written to

William ranging from $100.00 to $10,000.00 over the course of close to twenty years from December 23, 1989, through April 4, 2009. She stated that the checks were gifts to William and that "[t]he idea was that I didn't need this money right now, and hopefully I never will, but if I ever did he'd have it for me." She stated that "when my checking account would get more than I thought ought to be in it, I'd give it to [William]." She indicated that check 460 in the amount of $5,000.00 included a notation that it was "for Willy," her grandson and Cynthia and William's disabled son. She did not have any memory of why she indicated the money was for Willy. Mrs. McVicker testified that the gifts were intended for William, not for William and Cynthia. Two of the checks were signed by her husband, Mr. McVicker, with the same intention to hold for them in case they needed it. Mrs. McVicker also discussed her knowledge of the tax consequences of giving a gift over $10,000.00 in an annual period.

The first witness to testify at the hearing was Cynthia. She testified that she and William have a thirty-four-year-old dependent son who is totally disabled. She worked as the office manager at Radcliffe Elementary and had worked for the Hardin County Board of Education since 1998. Her gross monthly pay was $2,154.03 and her net monthly pay was $1,654.00. For purposes of her 2011 federal income taxes, her adjusted gross income was $27,494.00. Cynthia testified that she has two bank accounts, one for her direct deposit and one for her expenses. She drove a 2011 Honda Pilot, which she purchased in July 2010. She provided the mileage on the vehicle and stated that it was in excellent condition. The Kelley Blue Book provided that the trade-in value for her vehicle was $21,248.00. The private party sale value was $22,733.00. Cynthia paid $722.95 per month on the vehicle; the December 2012

statement provided that the payoff amount was $20,457.52. In addition to her car loan payment, Cynthia had a loan with The Cecilian Bank. The remaining balance was $3727.40, and her monthly payment was $201.47. She obtained the loan to pay for living and credit card expenses, and she paid off her Belk's, Macy's, and JC Penney's credit cards with the loan.

Cynthia went on to testify about her monthly expenses as listed on her disclosure statement, including utilities, telephone, car insurance, rental insurance, cable, and seasonal lawn care expenses. She paid $855.00 per month in rent, and she spent $200.00 to $250.00 per month on gas for her car. She spent $100.00 per month on clothing, and $100.00 to $150.00 per month on household supplies. She spent $50.00 per month on tanning. She also belonged to a fitness club, which cost less than $10.00 per month. She contributed 10% of her income to her church, or $330.00 per month. In 2011, she contributed $3,910.00. In 2012, she donated the same amount. She no longer had insurance because William canceled the plan. She enrolled in insurance through her work, which was set to take effect the following year. Her monthly payment was going to be about $68.00.[1]

Cynthia testified that she was not able to meet her reasonable needs with her income, and she had filed motions seeking temporary maintenance and financial relief throughout the pendency of the dissolution. She had been receiving funds from a joint investment account since 2010; she received $500.00 as well as the car payment of $722.95 each month. She had taken other draws from the investment account by agreement or order of the court. She received $8,000.00 in December 2012 to cover insurance, medical fees, and legal fees. In October 2011, she received $1,300.00 to cover her 2010 income tax liability pursuant to an agreed order. In July 2011, she drew $1,842.26 to pay her car insurance, registration, and taxes. She stated that she would owe taxes for 2012. She had been filing her taxes separately from William, and she had never claimed their dependent son on her taxes.

Cynthia and William purchased a house in Elizabethtown in 1983 for $70,000.00, $14,000.00 paid in cash, and the rest was secured by a promissory note that had been paid off in 1995. Prior to that, she and William had lived on North Miles for four years, and prior to that in Perryville. The house in Perryville was purchased by William a few months prior to their marriage. She was not aware of the funds William used to purchase the Perryville house; he stated that he would take care of it. William had always handled the finances. William was living in the current marital residence. When she and William separated, they owned two vans. Her van broke down, and William still drove the other one. In addition, William owned a sailboat, which he obtained prior to the marriage; a motorized hang-glider; a motorized parachute; and a motorcycle, all three of which William purchased during the marriage. Cynthia did not know the values of these items. She also testified about William's tools in the garage, which had been purchased during the marriage. She did not know what the tools were worth. Cynthia had not purchased any items of substantial value since the separation, with the exception of a television for her current residence. She knew that William had purchased two televisions, a computer, and a generator during that time.

1. The brochure filed as an exhibit established that her payment would be $62.76 per month for the plan she chose.

Cynthia testified about money that had been given to them during the course of the marriage by William's parents. She would receive an occasional check for her birthday from his mother, but William would receive money more often. These were large sums to be used for the family, but she never discussed how the funds were to be used with William. They would receive the money by check, and she did not know what William did with the checks. She did not have anything to do with the account and did not discuss the management of the money with him. She did not know what this money was spent on. William normally paid the bills and handled the finances during the marriage.

Cynthia testified that she feared for her safety when she left the marital residence. She chose to leave because she did not want to move her son. Her son is totally disabled, and this was the home he really remembers. She explained that he has a brain disease and is unable to care for or do anything for himself. He had a bather, needed assistance to use the bathroom, and he had a feeding tube. He attended an adult day care every day it was open. He received social security payments in the amount of $975.00 per month. Cynthia stated that she was not physically able to manage her son's daily needs, stating that he had seizures and she was unable to lift or carry him.

On cross-examination, counsel for William established that Cynthia had withdrawn $97,053.71 from the marital account pursuant to orders of the court, and they agreed that the court would determine what these draws constituted. She then testified about the marital residence, which the Property Valuation Administrator (PVA) had valued at $76,400.00. The attached lot was valued at $12,200.00, for a total value of $88,600.00. She and William had purchased the home for $70,000.00 in 1983. Regarding her living expenses, she rented a duplex for $855.00 per month and paid for yard work, totaling about $11,000.00 per year. She also paid more than $8,000.00 per year for her car. When she and her husband separated, they lived in a house with asbestos siding and she drove a 1998 Dodge van. She did not believe that she had been living above her means, but agreed that over a three-year period, she had withdrawn more than $96,000.00 to maintain her current lifestyle. She indicated that she spent $600.00 per year on tanning expenses, which she did not spend every year she lived with William.

Cynthia was then questioned about payments for the homes purchased during the marriage as well as the Perryville property William purchased just prior to the marriage in 1977 for $31,500.00. She did not provide any funds for the purchase of this property. On June 15, 1978, she and William purchased real estate in Elizabethtown for $28,500.00 cash in hand. She did not contribute any funds for this purchase. On December 1, 1978, she and William sold the Perryville property for $35,000.00. On June 13, 1983, she and William purchased the most current marital residence for $70,000.00, with $14,000.00 cash in hand. On July 20, 1983, she and William sold the Elizabethtown property for $41,000.00. She did not know whether William was entitled to $30,000.00 in a pre-marital interest in the marital residence. On redirect examination, Cynthia stated that she did not have any input in the purchase of the 1977 residence. She did not know if there was a mortgage on that house or on the house purchased later. She did not know where the $14,000.00 cash down payment for the marital residence came from.

William testified next. He was claiming $30,000.00 as a pre-marital interest based

upon his original investment in the 1977 Perryville property. He stated that when he sold a later house in 1983, he used all of the funds that he could from the sale of that property for the current property. William did not believe that the current residence was worth the PVA valued amount because the roof was leaking and the house needed a lot of repairs. He thought the house was worth $65,000.00, with $30,000.00 representing his pre-marital interest. William went on to testify about his motorized parachute and other items as well as his beliefs about their respective values. He believed the 1980 Plymouth van was worth less than $500.00. William also testified about the tools he owned and their respective values, all of which he purchased during the marriage, with the exception of some of the hand tools.

Next, William testified about the investment accounts with Morgan Stanley. He had several accounts, including a personal account belonging to him and Cynthia in the amount of $153,470.27 as of October 31, 2012, less amounts taken out for Cynthia. The second account, which was in his name only, was the account from his mother, and it totaled $152,512.36 as of October 31, 2012. His mother had given him $117,100.00 for the account; the amount had increased due to interest and dividends. He managed the accounts on his own, without Cynthia's input. He stated that the gifts from his mother were for him and were to be invested as emergency back-up for his parents. The money would be his when his parents passed away. William requested that the amount of funds in this account be designated as his non-marital property. William went on to discuss his work for Kentucky Utilities. He began working there in 1972 and retired twenty-two years later. He conceded that he and Cynthia should split their retirements pursuant to the applica-

ble formula. His retirement account was worth $427,865.49. He had a second retirement account worth $6,183.19, which he agreed they should split as well. William stated that the health insurance had expired and that his retirement benefits had decreased once he received his social security benefits.

William testified about how he took care of their disabled son on a daily basis, including having him bathed, feeding him, getting him ready to be picked up for daycare, getting him off the bus, feeding him dinner, and getting him ready for bed. Their son began experiencing seizures at the age of five months, and this condition had progressed over the years. William stated that he was going to keep up this responsibility. His son drew $991.00 per month in benefits, which did not pay for all of his expenses. Therefore, William supplemented the amounts he received with his own funds. Because of this, he requested 70% of the investment account to be able to make his son as safe and comfortable as possible. William needed additional funds to take care of him.

William then testified about his monthly expenses and income, including $1,371.00 in social security benefits and $520.81 in retirement pension benefits for a total in excess of $1,800.00. Earlier, his income had been higher, but it had decreased due to the option he chose regarding how much he would receive in social security benefits. William's monthly expenses totaled $2,058.00. He could not afford to pay Cynthia maintenance without selling stock. While they were married, their standard of living was good but not extravagant.

On cross-examination, William stated that only part of the $400.00 listed for food on his disclosure statement was for his son. He estimated that he gave approximately $150.00 per month to his church,

not $400.00 per month as in his disclosure statement, which is what he donated in 2011. He spent a little over $100 per month in gasoline. William stated that he kept meticulous records of the funds he received for his son. He attributed one-half of the maintenance of the house, utilities, and gas to his son's account. Only snacks that William bought for his son to eat did he charge to his son's account. Otherwise, he paid for all of the food they both ate. Regarding the home he currently lived in, William stated that he paid off the promissory note in five years. He did not recall borrowing the $14,000.00 cash from his father for the down payment. His father told him that he would give him funds if he needed it, but William did not recall if he actually gave him any money. William did not have any documents establishing the source of the funds he used to pay for the home he bought in 1977 just prior to their marriage. He borrowed some money from a local bank; he did not pay cash for the full value of the house, but he thought he had $15,000.00 or $20,000.00 in cash to pay for it. For the first marital home, he did not have any records establishing the mortgage amount. He thought he had enough equity in the Perryville home to pay for the second house.

Regarding the checks he received from his parents, William stated the money was meant to be invested to earn money, even if they were marked for Christmas or for his son. He would deposit these checks in various bank accounts that he had, but the larger checks went directly to a certificate of deposit. He could not recall where each of the checks was deposited. All of the funds ended up in one of the personal Morgan Stanley accounts. He gave his parents half of the interest earned on the account for a period of time until his father asked him to stop doing so. He had not withdrawn any funds from any of the ac-

counts during the pendency of the proceedings. He currently owned a 1990 Plymouth Voyager van worth $311.00, a 2002 Kia Rio worth $1,475.00, and a 2001 Mazda Miata worth about $4,900.00. His 1981 Honda motorcycle was worth $450.00. These values came from the tax assessments for each vehicle.

Cynthia testified again on redirect examination. Regarding the value of the marital residence and adjacent lot, she did not agree with William's assessment. She had obtained an appraisal of the house earlier in the litigation in May 2010, which showed a value of the house and property of $130,000.00. William entered exhibits showing the PVA values for surrounding properties by avowal.

Upon questioning by the court, Cynthia stated that she had been primarily responsible for taking care of their disabled son for thirty-two years. She stated that she had obtained a mutual restraining order after filing for an emergency protection and domestic violence order. At the end of the hearing, the parties were ordered to submit proposed Findings of Fact, Conclusions of Law and Decrees, as well as the *Poe v. Poe*, 711 S.W.2d 849 (Ky.App.1986), formulas for the split of the retirement benefits, which the parties provided.

On April 23, 2013, the family court entered its Findings of Fact, Conclusions of Law and Decree, dissolving the parties' marriage. Regarding custody of their disabled son, the court ordered William to retain primary possessory parenting responsibilities with Cynthia exercising parenting time. The court noted that William had been receiving and managing the child's social security payments since August 2010, and this arrangement was to continue. Regarding the marital residence, the court considered evidence related to both the current value of the proper-

ty (both the house and the lot) and the value of William's claimed pre-marital interest in the property. Cynthia argued that the property was worth $130,000.00, and William argued that it was worth less that the PVA value of $88,600.00, based upon the values of three comparable properties. The court ruled that the 2012 PVA value of the property of $78,700.00 was the proper amount; this amount was the total of $66,700.00, the assessed value of the home, and $12,200.00, the assessed value of the adjacent lot, both as of January 1, 2012. William argued that he had a $30,000.00 pre-marital interest in the property based upon his original investment in the Perryville home purchased prior to their marriage in 1977. The court concluded that William had successfully traced $28,500.00 to the marital residence, making the marital portion $50,200.00. The court awarded the marital value of the property in equal portions to William and Cynthia.

Regarding William's claim to $152,512.00 in non-marital investments, the court agreed that all of the amounts, with the exception of a $5,000.00 check with "Willy" on the memo line, were considered non-marital gifts from William's parents. The court also determined that the increase in value through interest was also non-marital. Regarding the marital investments of $153,470.27, the court determined that William should receive 70% of that account in order to ensure the future of their disabled child, and Cynthia should receive the remaining 30%. The court found that Cynthia had withdrawn $97,053.17 from this account through January 1, 2013. The court then considered whether Cynthia was entitled to maintenance and determined that she was not. Accordingly, the money that she had withdrawn during the pendency of the action would be accounted against her portion of the marital investment account and she would have to pay back any portion of her 30% that she had overdrawn. The court also considered the parties' respective vehicles, noting that Cynthia purchased a 2011 Honda Pilot for $38,000.00 after she left the marital home for which she was paying $722.00 per month. William had a 2001 Mazda Miata worth $4,900.00 and a 2002 Kia Rio worth $1,475.00. Finally, the court ordered the parties to pay their respective attorney's fees.

Cynthia filed a Kentucky Rules of Civil Procedure (CR) 52.02 motion for additional findings and a CR 59.05 motion to alter, amend, or vacate the court's order related to William's claim to the non-marital investment account, interest in the same investment account, William's non-marital real estate interest, the division of the marital joint investment account, the parties' vehicles, and the decision not to award maintenance. William objected to the motion, and the family court denied Cynthia's motion on June 25, 2013, incorporating the entirety of William's response into the order. This appeal now follows.

On appeal, Cynthia continues to argue that the family court abused its discretion in awarding William a non-marital interest in the marital home, in assigning William an investment account as non-marital property, in dividing the marital investment account, in failing to consider the values of the marital vehicles, and in denying her request for maintenance. William, on the other hand, contends that the family court did not abuse its discretion and that its findings and conclusions are supported by the record.

CR 52.01 provides the general framework for the family court as well as review in the Court of Appeals: "In all actions tried upon the facts without a jury or with an advisory jury, the court shall find the facts specifically and state sepa-

rately its conclusions of law thereon and render an appropriate judgment[.] . . . Findings of fact, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." *See Moore v. Asente,* 110 S.W.3d 336, 354 (Ky.2003) (footnote omitted) (An appellate court may set aside a lower court's findings made pursuant to CR 52.01 "only if those findings are clearly erroneous."). The *Asente* Court went on to address substantial evidence:

"[S]ubstantial evidence" is "[e]vidence that a reasonable mind would accept as adequate to support a conclusion" and evidence that, when "taken alone or in the light of all the evidence, . . . has sufficient probative value to induce conviction in the minds of reasonable men." Regardless of conflicting evidence, the weight of the evidence, or the fact that the reviewing court would have reached a contrary finding, "due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses" because judging the credibility of witnesses and weighing evidence are tasks within the exclusive province of the trial court. Thus, "[m]ere doubt as to the correctness of [a] finding [will] not justify [its] reversal," and appellate courts should not disturb trial court findings that are supported by substantial evidence.

*Id.* at 354 (footnotes omitted). With this standard in mind, we shall address the issues Cynthia raised in her brief.

■ Cynthia's first argument addresses whether the family court properly held that William had sufficiently traced his non-marital interest in the marital residence.

A trial court's ruling regarding the classification of marital property is reviewed *de novo* as the resolution of such issues is a matter of law. *Heskett v. Heskett,* 245 S.W.3d 222, 226 (Ky.App. 2008). We review a trial court's determinations of value and division of marital assets for abuse of discretion. *Armstrong v. Armstrong,* 34 S.W.3d 83, 87 (Ky.App.2000) (quoting *Duncan v. Duncan,* 724 S.W.2d 231, 234–35 (Ky.App. 1987)).

*Young v. Young,* 314 S.W.3d 306, 308 (Ky. App.2010). Kentucky Revised Statutes (KRS) 403.190(2) defines "marital property" as:

For the purpose of this chapter, "marital property" means all property acquired by either spouse subsequent to the marriage except:

(a) Property acquired by gift, bequest, devise, or descent during the marriage and the income derived therefrom unless there are significant activities of either spouse which contributed to the increase in value of said property and the income earned therefrom;

(b) Property acquired in exchange for property acquired before the marriage or in exchange for property acquired by gift, bequest, devise, or descent;

(c) Property acquired by a spouse after a decree of legal separation;

(d) Property excluded by valid agreement of the parties; and

(e) The increase in value of property acquired before the marriage to the extent that such increase did not result from the efforts of the parties during marriage.

■ With the statutory requirements of KRS 403.190 in mind, the Supreme Court of Kentucky extensively addressed the classification and division of property in *Sexton v. Sexton,* 125 S.W.3d 258 (Ky.2004). The Court explained that "[u]nder KRS 403.190, a trial court utilizes

a three-step process to divide the parties' property: '(1) the trial court first characterizes each item of property as marital or nonmarital; (2) the trial court then assigns each party's nonmarital property to that party; and (3) finally, the trial court equitably divides the marital property between the parties.'" *Id.* at 264–65 (footnote omitted). A particular item of property might consist of both marital and nonmarital components, which would require the court to "determine the parties' separate nonmarital and marital shares or interests in the property on the basis of the evidence before the court." *Id.* at 265 (footnote omitted). The court must apply the "source of funds" rule in order to characterize the property or the parties' interests in it as marital or non-marital. *Id.* (footnote omitted). The Court stated that "[n]either [the] title nor the form in which property is held determines the parties' interests in the property[.]" *Id.*

 The *Sexton* Court went on to explain the concept of tracing as it applies to the determination of whether property, or some portion of it, is marital or nonmarital:

"Tracing" is defined as "[t]he process of tracking property's ownership or characteristics from the time of its origin to the present." In the context of tracing nonmarital property, "[w]hen the original property claimed to be nonmarital is no longer owned, the nonmarital claimant must trace the previously owned property into a presently owned specific asset." The concept of tracing is judicially created and arises from KRS 403.190(3)'s presumption that all property acquired after the marriage is marital property unless shown to come within one of KRS 403.190(2)'s exceptions. A party claiming that property, or an interest therein, acquired during the mar-

riage is nonmarital bears the burden of proof.

*Sexton,* 125 S.W.3d at 266 (footnotes omitted). In *Polley v. Allen,* 132 S.W.3d 223, 229 (Ky.App.2004), this Court also addressed the tracing requirement:

A claimant cannot meet the tracing requirement simply by showing that he or she brought non-marital property into the marriage without also showing that he or she has spent his or her nonmarital assets in a traceable manner during the marriage. Under such circumstances, the trial court will not assign the property to the claimant as nonmarital property, but it may consider non-marital contribution as a factor when it makes a just division of the parties' marital property. [Footnote omitted.]

 In the present case, the family court considered the deeds memorializing the transfers of property at issue, beginning with the deed for the 1977 purchase by William prior to the marriage. The court found as follows:

In tracing Mr. McVicker's original funds of $31,500 which he states he paid for the original home in Perryville through to the current property, the Court reviewed the dates of the purchase of the second and third homes and the dates of the sale of the first and second homes, it became apparent to the Court why there might have appeared to be a disconnect.

Home number 2, the home on Miles Street in Elizabethtown, was purchased in June, 1978 and home number 1, the home in Perryville, was not sold until December, 1978. Obviously, it was not possible for Mr. McVicker to invest his entire pre marital investment of approximately $31,500 from home number 1 into home number 2 at the time of the purchase in June, 1978. Mr. McVicker con-

tends that ... when it was sold he did use it to pay the balance owed on home number 2. In fact he said "I paid everything I could to keep rolling the money forward because that was the prudent thing to do."

A similar timing event occurred again because the current property, home number 3, was purchased on June 13, 1983 but home number 2 was not sold until July, 1983. However, Mr. McVicker maintains that he always paid the proceeds from each home sale on the next home purchased even if it was not at the time of the purchase. Mrs. McVicker did not dispute the fact that he did have pre marital investment in their first home. She simply stated "I don't know." Mrs. McVicker stated that none of her own personal funds went into the purchase of home number 1.

Because the purchase price of home number 2 was only $28,500, this reduces his pre marital interest from $31,500 to $28,500 since that is the most he could have invested in this second home from the funds he initially invested in the first home.

Therefore the Court has determined that the Respondent has adequately traced his initial investment from the original home in Perryville up to the total amount of $28,000 as explained hereinafter, from the marital home value which has been ruled to be $78,700.

As set forth in *Sexton, supra,* William had the burden to establish his claimed non-marital interest in the property. Cynthia contends that the family court did not have a basis for finding a non-marital interest in the 1977 home because William failed to produce any evidence of his actual ownership interest in that property at the time of the marriage or evidence of the net proceeds from the sale of that home in the form of documentation. We must agree

with Cynthia that William failed to meet his burden of proving that he retained a non-marital interest in the marital residence.

A chronological listing of the property transactions is helpful to our resolution of this issue:

- August 5, 1977—William purchases Perryville property from the Johnsons for $31,500.00 prior to his marriage to Cynthia (Property Number 1).
- June 15, 1978—the McVickers purchase the South Miles Street property in Elizabethtown from the Buchanans for $28,500.00 cash in hand (Property Number 2).
- December 1, 1978—the McVickers sell Property Number 1 to the Johnsons for $35,000.00.
- June 13, 1983—the McVickers purchase White Oak Drive property (the current marital residence) in Elizabethtown from the Stiles for $70,000.00 ($14,000.00 cash in hand and $56,000.00 secured by promissory note of same date).
- July 20, 1983—the McVickers sell Property Number 2 to Leona Gilliam for $41,000.00.

First, there is no documentary evidence to trace William's pre-marital investment in Property Number 1. William testified that he did not pay the entire purchase price in cash; rather, he thought he had paid $15,000.00 or $20,000.00 in cash and had financed the rest of the purchase price through a loan from a local bank. He did not present any evidence other than his testimony to establish this fact or the source of funds for the original purchase. Second, there is no evidence, other than William's testimony, to establish that the funds obtained from the sale of Property Number 1 went to the purchase of Proper-

ty Number 2, or that the funds from the sale of Property Number 2 went to the purchase of the current marital residence. This is especially true because the subsequent property purchases took place before the prior properties were sold. William only testified that he thought he had enough equity in Property Number 1 to pay for Property Number 2. William's testimony, alone, is not sufficient to meet his burden of proof that he had a non-marital interest in the marital residence. Therefore, the family court's findings of fact in this regard are not supported by substantial evidence of record and are clearly erroneous. Accordingly, we hold that the family court erred as a matter of law in assigning William a $28,500.00 non-marital interest in the marital residence and reverse its decision.

▮ Next, we shall consider whether the family court abused its discretion in determining that the Morgan Stanley investment account containing $152,512.00, with the exception of $5,000.00, was William's non-marital interest and in assigning it to him. William claimed, and the family court agreed, that this account held the funds received from William's parents that were intended to be invested for them. There is no dispute that the funds were given to William; he established this through copies of the checks from his parents given to him over a twenty-year period. However, we must agree with Cynthia that William failed to adequately trace the funds transferred in these checks to the Morgan Stanley investment account at issue, other than through his testimony. William testified that he would deposit the checks he received from his parents in various bank accounts that he had and that the larger checks went directly to a certificate of deposit, but he could not recall where each of the checks was deposited. He testified that all of the funds ended up

in one of the personal Morgan Stanley accounts. However, there is no documentary evidence to trace the funds he deposited in various banks or certificates of deposit to the Morgan Stanley account. Therefore, we must hold that the family court's findings of fact on this issue were not supported by substantial evidence and were clearly erroneous. William did not meet his burden to establish that the Morgan Stanley account contained the funds he received from his parents and therefore, the funds in this account, and any interest earned, should not have been deemed non-marital and assigned to William. Accordingly, we must reverse the circuit court's assignment of this account as William's non-marital property.

▮ Next, Cynthia argues that the family court abused its discretion in dividing the marital Morgan Stanley account, which contained $153,470.27. KRS 403.190(1) requires a court to "divide the marital property without regard to marital misconduct in just proportions considering all relevant factors including:"

(a) Contribution of each spouse to acquisition of the marital property, including contribution of a spouse as homemaker;

(b) Value of the property set apart to each spouse;

(c) Duration of the marriage; and

(d) Economic circumstances of each spouse when the division of property is to become effective, including the desirability of awarding the family home or the right to live therein for reasonable periods to the spouse having custody of any children.

"What constitutes a just division lies within the sound discretion of the family court and will not be disturbed absent an abuse of discretion." *Hempel v. Hempel,* 380 S.W.3d 549, 553 (Ky.App.2012), citing *Neidlinger v. Neidlinger,* 52 S.W.3d 513 (Ky.2001).

Here, the family court awarded William 70% of the marital Morgan Stanley account solely based upon findings related to their adult disabled son. The family court inferred that the funds in this account were "for the future benefit of the child," and it went on to find that William had been and would continue to act as his primary caretaker, that Cynthia had not managed her money as conservatively since the separation as during the marriage, and that it was "in the best interest of the disabled child" to award William 70% of these funds "for his continued management and investment." The family court does not appear to have considered the statutory factors listed in KRS 403.190(1) at all in reaching this conclusion. Pursuant to the testimony at the hearing, the funds from this account had not been used for their son's benefit; rather, their son's expenses were covered by his own disability benefits and a portion of William's income. Therefore, we must hold that the family court abused its discretion in awarding William 70% of the marital investment account based solely on future benefit of their adult disabled son and vacate this ruling for proper consideration of the statutory factors.

Next, Cynthia argues that the family court abused its discretion in failing to consider the value of their respective marital vehicles and properly divide this marital property. In the order denying her CR 52.02 and CR 59.05 motion for relief, the family court stated that the value of her vehicle was not established at the hearing. We agree with Cynthia that this is incorrect, as she provided documentary evidence to establish the fair market value of her Honda Pilot as well as the outstanding balance of the loan for that vehicle. On remand, the family court shall consider the value of the parties' respective vehicles in dividing the marital assets.

Finally, Cynthia contends that the family court abused its discretion in denying her request for maintenance. She argues that the family court did not consider the statutory requirements and that it considered her request as it divided the marital property rather than after the division was complete.

KRS 403.200(1) provides that a court may grant maintenance only if it finds the spouse seeking it "[l]acks sufficient property, including marital property apportioned to him, to provide for his reasonable needs" and "[i]s unable to support himself through appropriate employment[.]" "While the award of maintenance comes within the sound discretion of the trial court, a reviewing court will not uphold the award if it finds the trial court abused its discretion or based its decision on findings of fact that are clearly erroneous." *Powell v. Powell,* 107 S.W.3d 222, 224 (Ky.2003). *See also Brenzel v. Brenzel,* 244 S.W.3d 121, 126 (Ky.App.2008) ("An award of maintenance and the amount are within the discretion of the trial court."). "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Sexton v. Sexton,* 125 S.W.3d at 272, citing *Commonwealth v. English,* 993 S.W.2d 941, 945 (Ky.1999).

If an award of maintenance is found to be appropriate pursuant to KRS 403.200(1), a court must then consider all relevant factors in determining the amount and duration of maintenance pursuant to KRS 403.200(2). These factors include the spouse's financial resources, the time needed to obtain sufficient education or training, the standard of living during the marriage, the duration of the marriage, the age and condition of the spouse seeking maintenance, as well as the ability of the paying spouse to meet his needs. Similar-

ly, "the amount and duration of maintenance is within the sound discretion of the trial court." *Weldon v. Weldon,* 957 S.W.2d 283, 285 (Ky.App.1997).

 In the present case, the family court based its decision not to award Cynthia maintenance on its findings that her current standard of living "appears to greatly exceed the standard during her marriage and her gross income actually exceeds the gross income of [William]" and that she had already received "a sizeable marital estate ... from the marital stocks and from the real estate equity and from [William's] retirement." We note that Cynthia's portion of the marital residence was $25,100.00 and that her portion of William's retirement benefits was approximately $178,000.00. She was also awarded 30% of the marital investment account as of the date of dissolution (her 30% was $46,041.06 as of October 2012), but the funds she had withdrawn, $97,053.17 as of January 1, 2013, were to be deducted from the amount she received. Any amount that was overdrawn from her 30% share was to be repaid through funds she received from the real estate equity, personal property, and William's retirement.

Based upon our decision above to reverse the family court's assignment of nonmarital interests and division of marital property, we must vacate the family court's decision on maintenance. On remand, after the court has properly assigned and divided the marital and nonmarital (if any) property, it must determine whether Cynthia is entitled to an award of maintenance considering the factors in KRS 403.200(1). If she is entitled to such an award, the court must then determine the amount and duration of maintenance to which she is entitled, considering the factors set forth in KRS 403.200(2), which includes the standard of living established during the marriage.

The family court should not have considered this factor in determining whether Cynthia was entitled to maintenance; only if maintenance is found to be appropriate does the family court have to consider this factor.

For the foregoing reasons, the judgment and order of the Hardin Family Court is reversed in part and vacated in part, and this matter is remanded for further proceedings in accordance with this opinion.

JONES, JUDGE, CONCURS.

ACREE, CHIEF JUDGE, CONCURS AND FILES SEPARATE OPINION.

ACREE, CHIEF JUDGE, CONCURRING:

I concur with the majority.

However, I take this opportunity to note that, although the appellant's brief makes numerous citations to the video record, the appellant's counsel has engaged in the not-uncommon practice of creating an appendix from counsel's file and citing that appendix in the body of the brief. Such practice does not satisfy the requirements of CR 76.12(4)(c)(iv) and (v).

Parties to an appeal must give assurance to all reviewing courts that statements of fact (whether of events giving rise to the cause of action or of the procedural history of the case) are supported by the record created by the parties and the trial court. This requirement can only be satisfied by citation to the *certified* record; that means citation to page numbers in the paper record that were placed there by the circuit court clerk during certification, or to time references to a video created during recording (which appellants appear to have done), or to exhibits or depositions that have been filed with the trial court and marked for identification by the clerk.

This procedural deficiency has not had a detrimental effect on appellant in this case. However, counsel for appellant should abandon this procedure in future appearances before this court and fully comply with CR 76.12.