RENDERED: SEPTEMBER 8, 2023; 10:00 A.M.
TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2022-CA-0960-MR

ETHEL POLLY BRADLEY                                 APPELLANT

                   APPEAL FROM FLOYD FAMILY COURT
v.               HONORABLE DWIGHT S. MARSHALL, JUDGE
                       ACTION NO. 16-CI-00043

CHARLES R. BRADLEY                                  APPELLEE

OPINION
REVERSING AND REMANDING

** ** ** ** **

BEFORE: CETRULO, ECKERLE, AND GOODWINE, JUDGES.

CETRULO, JUDGE: Appellant Ethel Polly Bradley ("Polly") appeals the Floyd Family Court's findings of fact, conclusions of law, and judgment ("Decree of Dissolution") dissolving her marriage to Appellee Charles Randy Bradley ("Randy"). Polly argues the family court improperly adopted an order tendered by Randy and committed reversible errors regarding attorney's fees, maintenance, and marital distributions. Upon review, we reverse and remand for further findings and clarification of the distribution of marital assets, to include a possible maintenance award.

## I. FACTS AND BACKGROUND

Polly and Randy were married in June 1982. Polly petitioned for dissolution of the marriage in January 2016. Through the next six years, Polly and Randy litigated the dissolution of their marriage, eventually coming before the Floyd Family Court for a final hearing over two days – May 12 and November 29, 2021. During the final hearing, the family court heard testimony from two certified public accountants, Calvin Cranfill ("CPA Cranfill"), and Kim Lockhart ("CPA Lockhart"); a certified appraiser, Paul David Brown ("Appraiser Brown"); and a business valuator, Dan Wells ("Valuator Wells"). After the final hearing, both parties submitted proposed orders, and in July 2022, the family court entered the Decree of Dissolution.

During the marriage, Randy worked continuously in the gas and oil industry, owning (in whole or in part) four companies that operated approximately 572 oil and gas wells: full ownership of Basin Energy Company ("Basin") and Troublesome Creek Gas Corporation ("Troublesome Creek"); 49% of Tina Gas Company ("Tina Gas"); and 50% of R1 Compressor. These oil and gas interests made up the bulk of marital assets. Polly, with the exception of the first two years of their marriage, worked as a homemaker. After the price of oil and gas fell in 2014, Randy and Polly's financial situation took a turn for the worse and Randy filed for bankruptcy protection. Polly did not file for bankruptcy. In October

2016, all income, assets, and debts of the marital estate in Randy's name were part of the bankruptcy estate; the bankruptcy filing protected the marital estate from dissolution.

Polly and Randy lived together in Kentucky from the time of their marriage until the summer of 2005. That summer, Polly and her youngest child moved to Los Angeles. Randy remained in Kentucky with the other children and worked the oil and gas businesses. In 2009, the youngest child moved back to Kentucky for high school, but Polly remained in Los Angeles alone until 2016. By the time Polly petitioned for dissolution, Polly and Randy's five children had all reached the age of majority, and Polly and Randy had amassed considerable assets (mostly accrued through the interest in oil and gas ventures) and considerable debt (including significant tax debt).[1]

The Decree of Dissolution allocated a 60/40 division of the marital estate, in favor of Randy. The Decree of Dissolution denied Polly's request for additional attorney's fees, but Randy did pay partial attorney's fees to Polly's legal counsel through the course of litigation. Polly now appeals the Decree of Dissolution.[2] As an initial matter, Polly argues (A) that the family court's

---

[1] The Internal Revenue Service claimed a tax debt of more than $1.5 million, and the Kentucky Revenue Cabinet claimed a tax debt of more than $330,000.

[2] Polly also challenges the orders entered on May 1, 2019; June 17, 2019; July 10, 2019; and March 31, 2021. However, those orders are temporary, interlocutory orders (granting temporary maintenance, appointing experts, and providing partial fees) and are not appealable. *See Lebus v.*

"mechanical adoption" of Randy's tendered findings of fact and conclusions of law violated Kentucky Rule of Civil Procedure ("CR") 52.01 and warrants reversal. Also, substantively, Polly argues the family court abused its discretion when it (B) failed to equitably divide the marital estate or grant permanent maintenance; and (C) improperly denied Polly's request for additional attorney's fees. Each issue will be addressed in turn, and additional facts will be supplied as necessary.

## II.  ANALYSIS

### A.  Adoption of Tendered Order

On appeal, Polly argues that the family court erred by adopting Randy's proposed findings of fact and conclusions of law contrary to its responsibilities set forth in CR 52.01 ("[T]he court shall find the facts specifically and state separately its conclusions of law thereon and render an appropriate judgment[.]"). Polly argues that nothing in Kentucky precedent "suggests that it is good practice to permit counsel for one party to author an exhaustive opinion[.]" We agree. Adopting one party's tendered order is *not good practice*, especially in complex, sensitive, and detailed family matters. *See T.R.W. v. Cabinet for Health*

*Lebus*, 382 S.W.2d 873, 874-75 (Ky. 1964); *see also* Kentucky Revised Statute ("KRS") 403.160 (trial court may issue temporary maintenance orders, which terminate when the final decree is entered); *see also Cabinet for Health & Fam. Servs. v. Jefferson Cnty. Att'y's Off.*, 668 S.W.3d 217, 221 (Ky. App. 2023) (discussing the collateral order doctrine and the *very limited circumstances* under which an interlocutory order is appealable). Here, the Decree of Dissolution addressed those issues (maintenance, experts, attorney's fees) and we shall evaluate them as they appear in that final and appealable order.

*& Fam. Servs.*, 599 S.W.3d 455, 459 (Ky. App. 2019) (citing *Callahan v. Callahan*, 579 S.W.2d 385, 387 (Ky. App. 1979)) (stating that while permissible under certain circumstances, such a practice "is frowned upon by the appellate courts of Kentucky"). This matter was pending for more than six years and involved complex issues and combined assets of in excess of $5 million, similarly significant debts, and multiple business entities and arrangements. It is hard to imagine a more "complex family matter." *Id.* at 459.

We note CR 52.01 does not forbid the family court from adopting proposed orders from the parties; nor does the Kentucky Supreme Court. *See Prater v. Cabinet for Human Resources, Commonwealth of Kentucky*, 954 S.W.2d 954, 956 (Ky. 1997) (citing *Bingham v. Bingham*, 628 S.W.2d 628, 628-30 (Ky. 1982)) ("It is not error for the trial court to adopt findings of fact which were merely drafted by someone else."). As this Court recently pointed out, "[t]he Supreme Court has not overruled *Bingham* or *Prater*." *Keith v. Keith*, 556 S.W.3d 10, 14 (Ky. App. 2018). However, such a practice is not without restraints. "An appellate court will affirm an order supported by substantial evidence" unless a party shows that "the decision-making process was not under the control of the judge or that these findings and conclusions were not the product of the deliberations of the trial judge's mind." *Keith*, 556 S.W.3d at 14 (quoting *Bingham*, 628 S.W.2d at 629-30) (internal quotation marks omitted).

Here, Polly has not clearly shown that the decision-making process was not under the control of the trial judge or that the Decree of Dissolution was not a product of the deliberations of his mind. The parties first appeared before the family court on March 1, 2016 for a status quo hearing, and that *same trial judge* conducted more than 13 hearings[3] over the next six years.

The final hearing took place over two days – May 12, 2021 and November 19, 2021 – and Randy testified via deposition on December 14, 2021. Thereafter, the parties *both* submitted tendered orders, as they had consistently done through the six years of litigation. On April 19, 2022, the family court held an additional hearing via teleconference. At that hearing, the judge stated that he had read a transcript of Randy's deposition and would "watch the video also." Thus, we cannot say that the family court did not personally consider the various issues and evidence presented. However, as will become apparent, we also cannot determine that the family court's adoption of Randy's tendered order and calculation of assets and debts were supported by substantial evidence. Rather, an independent review of the record left us with more questions than answers; in particular, with the asset and liability breakdown ("distribution breakdown")

---

[3] Our independent review of the record found hearings in this matter on March 1, 2016 (in person); April 5, 2016 (in person); July 5, 2016 (in person); November 2, 2016 (in person); July 18, 2017 (in person); June 4, 2019 (in person); April 16, 2019 (in person); June 18, 2019 (in person); March 16, 2021 (teleconference); April 6, 2021 (teleconference); May 12, 2021 (in person); November 19, 2021 (in person); and April 19, 2022 (teleconference). Although the attorneys varied, the same judge was present for all the hearings.

attached to the end of the Decree of Dissolution. This distribution breakdown appears as the last page of the Decree of Dissolution, after the family court's signature, and confusingly still retains the heading "R's Exhibit A to FINDINGS OF FACT AND CONCLUSIONS OF LAW." It was clearly the calculations prepared by Randy's counsel and resulted in a payment of only $22,023 by Randy to Polly.

### B. Equitable Division of Marital Estate

When disposing of property in a dissolution of marriage action, KRS 403.190 requires the family court to follow a three-step process: "(1) the trial court first characterizes each item of property as marital or nonmarital; (2) the trial court then assigns each party's nonmarital property to that party; and (3) finally, the trial court equitably divides the marital property between the parties." *Travis v. Travis*, 59 S.W.3d 904, 908-09 (Ky. 2001) (footnotes and citations omitted).

KRS 403.190(3) creates a "presumption that all property acquired after the marriage is marital property unless shown to come within one of KRS 403.190(2)'s exceptions." *Sexton v. Sexton*, 125 S.W.3d 258, 266 (Ky. 2004) (citations omitted). When dividing the marital property, KRS 403.190(1) requires the family court to do so "in just proportions" after "considering all relevant

factors."[4] "'Just proportions' does not mean that the property must be equally divided, but only that a consideration of the factors in KRS 403.190 has been made." *Muir v. Muir*, 406 S.W.3d 31, 36 (Ky. App. 2013).

"In all actions tried upon the facts without a jury[,]" including actions for dissolution of marriage, "[f]indings of fact [] shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." CR 52.01. A factual finding is clearly erroneous if unsupported by substantial evidence. *Hunter v. Hunter*, 127 S.W.3d 656, 659 (Ky. App. 2003) (citing *Owens-Corning Fiberglas Corp. v. Golightly*, 976 S.W.2d 409 (Ky. 1998)). "Substantial evidence is evidence, when taken alone or in light of all the evidence, which has sufficient probative value to induce conviction in the mind of a reasonable person." *Id.* (citing *Golightly*, 976 S.W.2d at 414). However, appellate courts review legal issues *de novo*. *Id.*

The award of maintenance comes within the sound discretion of the family court. *Weldon v. Weldon*, 957 S.W.2d 283, 285-86 (Ky. App. 1997) (citation omitted). The determination of maintenance involves a two-pronged analysis. KRS 403.200(1). First, the family court must decide whether the

---

[4] "(a) Contribution of each spouse to acquisition of the marital property, including contribution of a spouse as homemaker; (b) Value of the property set apart to each spouse; (c) Duration of the marriage; and (d) Economic circumstances of each spouse when the division of property is to become effective, including the desirability of awarding the family home or the right to live therein for reasonable periods to the spouse having custody of any children." KRS 403.190(1).

requesting spouse is entitled to maintenance by examining that spouse's financial needs and resources. *Wattenberger v. Wattenberger*, 577 S.W.3d 786, 787 (Ky. App. 2019) (citing *id.*). Pursuant to KRS 403.200(1), the family court may award maintenance if it finds that the spouse seeking maintenance (a) "lacks sufficient property, including marital property apportioned to [her], to provide for [her] reasonable needs"; and (b) "is unable to support [her]self through appropriate employment[.]" *McVicker v. McVicker*, 461 S.W.3d 404, 420 (Ky. App. 2015) (quoting KRS 403.200(1)). If, based on those elements, an award of maintenance is justified, the circuit court moves on to the second prong of the analysis: deciding the appropriate amount and duration of the award considering the factors of KRS 403.200(2). *McVicker*, 461 S.W.3d at 420.

Here, the Decree of Dissolution pointed out the particulars of the marriage and emphasized Polly's lack of contributions to the marital estate by stating:

> Both parties testified that they lived separate and apart since the [s]ummer of 2005. From 2005-2009, Polly had one child living with her, but 2009-2016, Polly lived in California alone. Polly testified that she returned to Prestonsburg in 2016. Polly failed to testify as to any contribution she made to the marital estate while in California. Randy lived at the marital residence while the remaining minor children all attended and graduated from Prestonsburg High School. The Court finds that Polly made little, if any, contribution to the marital estate as a "homemaker spouse" from 2005 to the Final Hearing [in 2021]. Randy testified at length as to his contributions to

-9-

the marriage. This Court finds the contribution of Randy for the final sixteen (16) years of this marriage far exceed any contributions from Polly. The majority of the value in this marital estate is directly related to Randy's work and talent in finding profitable production of oil and gas[.]

The family court thus concluded that the marital assets should be divided, with 60% to Randy and 40% to Polly.

Further, the Decree of Dissolution awarded Polly and Randy their current personal bank accounts, homes, furnishings, and vehicles.[5] Randy received nine parcels of land ranging in value from $1,800 to $170,000. Randy received six business bank accounts, apparently all with a negative balance. Randy was also allocated the couple's joint 2014 Kentucky tax debt, 2015 and 2016 overdue property tax debt, and the 2020 and 2021 federal and state income tax liabilities for income received from R1 Compressor, Tina Gas, Troublesome Creek, and Basin. According to the distribution breakdown, Polly received the 2019 and 2020 property taxes on her home. Polly and Randy were each directed to pay their individual attorney's fees. Randy received the debt owed to CPA Cranfill. As for the businesses,[6] Randy received 100% of the couple's interest in R1 Compressor,

---

[5] Polly received as marital property a Mercedes, a BMW (both previously owned by Troublesome Creek), and a van, all of which were unencumbered. Randy inherited a truck and Highlander, and those were awarded to him as non-marital property.

[6] Polly argues the family court abused its discretion by accepting CPA Cranfill's inaccurate business valuations that improperly applied "present worth discounts" to the wells and marketability reductions to the businesses' overall value. However, the time to challenge the experts' valuations, appraisals, and assessments has long since passed. The family court heard

Tina Gas, and Troublesome Creek (valued at $1.5 million by the family court) (less the vehicles transferred to Polly). Basin, the couple's fourth business entity interest (valued at $4.5 million by the family court), was said to be divided between Randy and Polly. However, the family court's ruling then accepts Randy's proposal that 38 wells/well interests would be transferred to Polly, while Randy retained 534 remaining wells/well interests. The family court directed Randy to execute a "well tending and accounting written agreement" to Polly to provide services that he "*volunteered*" to provide but that he valued at $666,900, if provided over 15 years. However, Randy was relieved of this obligation if Polly sold the wells. Then, in addressing maintenance, the Decree of Dissolution simply denied Polly any award of future maintenance.

Well, quite simply, we have a problem with the wells.

The body of the Decree of Dissolution states that "Polly will receive assets from this dissolution of more than $2,000,000." However, the

---

testimony from four experts: CPA Cranfill, CPA Lockhart, Appraiser Brown, and Valuator Wells. CPA Cranfill was appointed by *Agreed Order*. Polly does not take issue with CPA Lockhart's assessments. Appraiser Brown's appraisals were admitted into evidence without objection. Valuator Wells was Randy's witness, but Polly did not challenge his methodology or qualifications under *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), nor did she object to Wells' report being introduced into evidence. Polly asserts the family court effectively prevented her from hiring her own experts – to refute these business valuations – by denying her requests for additional funds prior to the final hearing. However, we find this argument to be inappropriate (as it pertains to prior, interlocutory orders) as well as disingenuous; Polly's legal counsel was awarded $50,000 in legal fees before the final hearing, *and* her counsel fronted $11,000 for Polly's cars and furniture to be returned to Kentucky.

aforementioned "distribution breakdown" not referenced at all in the Decree of Dissolution contains multiple "deductions" from that total, ultimately resulting in a payment by Randy to Polly of only $22,023 and a "credit" to Randy for his well-tending services over 15 years. The Decree of Dissolution noted that Polly's 38 wells and well interests had generated an income of approximately $130,552.47 in 2019. However, there was nothing to indicate the expected income production duration of the wells, nor was there any accommodation in the Decree of Dissolution if those wells stop producing next year, or the year after. Also, there is no language in the Decree of Dissolution that addresses the possibility of another fall in gas prices, possibly resulting in significantly less income. Moreover, in the distribution breakdown, the "well tending and accounting" fee was deducted from Polly's marital asset allocation, despite the fact that in Randy's deposition he offered to tend the wells free of charge.[7] Then, Polly's marital estate was reduced by the full amount of *15 years* of Randy's tending the wells, but there is no language about reimbursing Polly for these fees if (a) Polly sells the wells or (b) the wells dry up prior to 15 years. Finally, the Decree of Dissolution does not state

---

[7] Randy testified that he would tend these wells for no additional charge to Polly because he's "already there, already doing it" and "already got all these [wells] in [their] system." Further on in his deposition, Randy's legal counsel asked, "Why do you believe that you should not be required to pay Polly maintenance?" Randy answered, "Well with the wells that she'll be getting and us taking care of all of them for free for her, she should not have to have any more money." And yet, the distribution breakdown deducts $666,900 for "well tending and accounting by Randy for Polly for next 15 years[.]"

who will be responsible for the "plugging fees" when the wells are no longer income producing; therefore, we assume that obligation would fall to Polly. However, Randy himself testified that plugging fees range between $10,000 and $20,000 *for each well* depending on the depth of the well.[8] It appears, from our review, that when the wells "dry up" Polly will have to pay between $190,000 and $380,000 to plug them (assuming she only has to plug the wholly owned wells and not the wells in which she has an interest).

And so, it appears that Polly's purported "40%" of the marital estate said to be valued at $1,995,187 was reduced to an in-need-of-repair home, past due property taxes, two used cars, her private bank accounts (totaling less than $7,000), some sort of monthly installment payment by Randy, possibly income-producing wells, a check from Randy for $22,023.16, and possibly owed plugging fees of up to $380,000. Randy received ownership of all the businesses and most of the couple's debt, and his 60% of the marital estate totaled $3,418,988.19, *after* he had made all of the payments to result in the "equitable transfer" to Polly. We seek clarity on this distribution.

---

[8] In his deposition, Randy disagreed with Valuator Wells' business evaluation of Basin because the valuator did not adequately account for the "plugging fees" for each well. Valuator Wells allowed for a $10,000 plugging fee for each well, but Randy stated that $10,000 was "too low." Randy stated, "The biggest problem with the [Basin] valuation, and it's a common problem with everybody that's in the oil and gas business, is the plugging liabilities associated with the wells. Most of the time nobody wants to acknowledge the fact that somebody has to plug these wells eventually." Despite that, the Decree of Dissolution does not acknowledge the fact that somebody has to eventually plug these wells.

The lack of any explanation or even reference in the Decree of Dissolution to Randy's attached exhibit that was utilized by the family court, and was presumably the basis of the rulings, is troubling. Likewise, we have concerns regarding the creation of an "installment contract" as part of the property division. That contract is not part of the record on appeal; not part of the Decree of Dissolution; and it apparently is an obligation upon Randy that would end if Polly was forced to sell the wells. Numerous questions come to mind as to tax liabilities, income attributed to Polly, Randy's possible death during the 15 years; and none of these questions can be answered from the family court's fully adopted findings, conclusions, and decree, prepared by Randy's counsel.[9] While there were often failings on Polly's part to present evidence to counter Randy's, those do not eliminate the family court's obligation to equitably assign and divide the marital and non-marital property under KRS 403.190. With so many questions, we cannot find sufficient evidence to support the assignment and division herein.

Secondly, we accept that the award of maintenance comes within the sound discretion of the family court. *Weldon*, 957 S.W.2d at 285. Again, we note the Decree of Dissolution aptly pointed out the weaknesses of Polly's proof and the inconsistencies in Polly's legal argument: she requested permanent maintenance,

---

[9] The family court did change two dates from June to August on page 35. Otherwise, it and the exhibit referenced herein appear to be exactly as submitted by counsel.

but did not request a specified amount nor duration; and, she acknowledged there were multiple inaccuracies in the living expenses she submitted. However, the Decree of Dissolution does not adequately consider Polly's age and medical issues, her unlikely employability, her minimal social security, the testimony about the poor condition of her home, and her inability to provide for her reasonable needs. Additionally, the Decree of Dissolution, in denying maintenance, relied on Polly being able to support her reasonable needs with income received from the wells, but that well income expectation was not supported by substantial evidence. As such, the denial of maintenance requires further clarity – within and as a result of – a re-examination of the division of the marital estate.

Also, clarity is necessary on a non-marital debt attributed to Randy from his father's estate. The Decree of Dissolution states that Randy received a *non-marital* check for $242,159.52 from his father's estate, and Randy invested $217,158.52 of that inheritance into Basin. However, the distribution breakdown shows a debt to his father's estate for $468,000 that was included in toto in the distribution breakdown as a *marital* debt. Although inheritance is typically a non-marital asset, KRS 403.190(2)(a), it is unclear from the Decree of Dissolution if, under these circumstances, the debt was affected by the inheritance. Stated another way, because Randy is one of the beneficiaries to his father's estate, does the non-marital inheritance affect the marital debt owed by Basin?

-15-

Additionally, clarity is necessary as to the 2019 and 2020 property taxes on the home awarded to Polly. According to the distribution breakdown, Polly is responsible for the 2019 and 2020 Floyd County property taxes. However, the body of the Decree of Dissolution stated that there was a debt owed to Community Trust Bank in the amount of $30,070 that was traced to the payment in full of a property tax lien that was being foreclosed upon while this action was pending. That loan is solely in Randy's name. Does that loan include the cost of the property taxes or only the fees and interests associated with the foreclosure action? Did Randy create the possibility of the foreclosure action by not paying the taxes as directed, or did he assist Polly by paying the taxes despite the taxes being her responsibility during the litigation?

Therefore, the Decree of Dissolution was not supported by substantial evidence, and we must remand for a more complete and detailed allocation of marital assets with consideration of the factors in KRS 403.190 and thereafter application of KRS 403.200 to the maintenance determination.

### C. Attorney's Fees

KRS 403.220 governs attorney's fees and under this statute:

> a trial court may order one party to a divorce action to pay a reasonable amount for the attorney's fees of the other party, but only if there exists a disparity in the relative financial resources of the parties in favor of the payor. But even if a disparity exists, whether to make such an assignment and, if so, the amount to be assigned is within

the discretion of the trial judge. There is nothing mandatory about it. Thus, a trial court's ruling on attorney fees is subject to review only for an abuse of discretion.

*Sexton*, 125 S.W.3d at 272 (internal quotation marks and citations omitted).

On appeal, Polly claims the family court erred by denying, in the Decree of Dissolution, her request for additional attorney's fees. She received $40,000 in attorney's fees from Randy through the course of litigation, but her appellate brief states that "by the end of trial, Polly owed her attorney approximately $151,000." Polly argues that her temporary maintenance and her allocation of marital assets are not sufficient to cover her legal fees. However, the family court determined that Randy was not responsible for her remaining legal debt.

Because we are remanding for the clarification of the division of the marital estate as directed herein, the family court shall reconsider Polly's request for attorney's fees based on the factors listed in KRS 403.220. Still, we recognize that "[the trial court] is in the best position to observe conduct and tactics which waste the court's and attorneys' time and must be given wide latitude to sanction or discourage such conduct." *Gentry v. Gentry*, 798 S.W.2d 928, 938 (Ky. 1990).

## III. CONCLUSION

Therefore, we REVERSE and REMAND the Decree of Dissolution of the Floyd Family Court for further proceedings consistent with this Opinion.

-17-

ALL CONCUR.

BRIEFS FOR APPELLANT:          BRIEF FOR APPELLEE:

Louis P. Winner               Suzanne Baumgardner
Sidney M. Vieck               Kami C. Brumley
Louisville, Kentucky          Lexington, Kentucky